PEOPLE v HENDERSON

Docket No. 60920. Argued April 3, 1979 (Calendar No. 9).—Decided
    March 4, 1980.

    Johnny M. Henderson was convicted by a jury in Kent Circuit
        Court, George R. Cook, J., of embezzlement and arson. The
        defendant was the manager of a gasoline station in which there
        was a fire; more than $1,400 was missing from a combination
        floor safe found open after the fire was extinguished. The
        defendant testified in his own behalf, and the prosecutor cross-
        examined him, over objection, about his financial condition at
        the time of the crimes. The Court of Appeals, M. F. Cavanagh
        and Rood, JJ. (M. J. Kelly, P.J., dissenting in part), reversed
        because of the questions about his financial condition (Docket
        No. 29380). The people appeal. In a per curiam opinion, Justice
        Kavanagh dissenting, the Supreme Court *held:*

        1. There is a need to avoid undue prejudice in individual
        cases and to prevent establishment of a two-tiered standard of
        justice weighing more heavily on the poor. Evidence of a
        defendant's financial condition, because it ordinarily has lim-
        ited probative value and usually goes to a collateral issue, will
        often distract rather than aid the jury. Therefore, routine use .
        of evidence of financial condition is not allowed. However, the
        prosecutor's proofs in this case, rather than showing unemploy-
        ment, established that the defendant was not only employed,
        but held a managerial position. The evidence that his electric-
        ity was shut off for non-payment, viewed in light of this
        evidence of employment, carried with it no suggestion that the
        defendant was "poor". There is a difference between evidence of
        poverty and unemployment—evidence that a person is chroni-
        cally short of funds—and evidence of the sort involved in this
        case showing that a person is experiencing a shortage of funds
        that appears to be novel or contrary to what one would expect
        is typically felt by such a person.

        2. Evidence of poverty, dependence on public welfare, unem-
        ployment, underemployment, low-paying or marginal employ-
        ment, is not admissible to show motive. The probative value of
        such evidence is diminished because it applies to too large a
        segment of the population. Its prejudicial effect, though, is high.

There is a risk that it will cause jurors to view a defendant as a "bad man"—a poor provider, a worthless individual. Other evidence of financial condition may, however, be admissible in the circumstance of a particular case.

3. The motive for a theft offense seldom requires explanation; but embezzlement is not a typical theft offense. The embezzler, by definition, begins from a position of trust, and is usually gainfully employed. In this case, the evidence presented by the prosecution unavoidably showed that the defendant was employed in a managerial position, that only he and his district supervisor knew the combination to the service station safe, and that the defendant was the only person to have a key to the storeroom, which was found unlocked after the fire. In this case the motive for the offenses required explanation because jurors may have wondered why the defendant, who enjoyed both gainful employment and his employer's trust, would breach that trust and risk losing his employment.

4. That is not to say that evidence of a defendant's financial condition is admissible whenever embezzlement or a similar crime is charged, regardless of the nature of the evidence or the circumstances in which it is introduced. Testimony showing that the defendant's electricity had been shut off was not necessarily probative of an acute and seemingly atypical need for money at the time of the offense. A judge may, in the exercise of discretion, bar evidence of financial embarrassment when persuaded that it is insufficiently probative of need. The defendant did not seek to invoke the judge's discretion in that regard.

The decision of the Court of Appeals is reversed and the defendant's convictions are reinstated.

Justice Kavanagh dissented. The principle embraced in *People v Johnson*, 393 Mich 488; 227 NW2d 523 (1975), should not be restricted; the decision of the Court of Appeals should be affirmed for the reasons stated in it.

80 Mich App 447; 264 NW2d 22 (1978) reversed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *David H. Sawyer,* Prosecuting Attorney, and *Donald A. Johnston,* Chief Appellate Attorney, for the people.

*Buth, Wood & Weidaw* (by *George S. Buth* and *Stephen M. Tuuk)* for defendant.

Per Curiam. Johnny Mack Henderson was convicted of arson and embezzlement. The issue is whether it was error to permit, over objection, cross-examination of Henderson concerning his financial condition.

We hold that it was not, reverse the decision of the Court of Appeals and reinstate Henderson's convictions.

# I

Henderson was convicted of arson of real property[1] and embezzlement over $100.[2] The charges arose out of a fire and theft at the service station which Henderson managed.

The station was found in flames. When they were extinguished the combination safe was found open and empty of money. Over $1,400 was missing.

There was no evidence of forced entry into the building or safe. The main power panel controlling the gasoline pumps had been unlocked. The padlocks on the individual pumps were found open and undamaged. The hoses from the pumps were stretched out and the nozzles locked open to continually dispense gasoline toward the station.

The door to the interior storeroom was unlocked and standing open. The contents of the storeroom had been drenched in gasoline. From the length of the pump hoses and the slope of the driveway, it appeared that this gasoline had been carried in and poured from a container.

The fire was started by igniting the flowing gasoline. It was extinguished before reaching the storeroom.

[1] MCL 750.73; MSA 28.268.
[2] MCL 750.174; MSA 28.371.

The employees assigned to the station were Henderson and Samuel Chapman, an attendant. Both had keys to the front door, the main power panel and the pumps. Only Henderson had a key to the storeroom, but a duplicate set was kept in the safe. Only Henderson and his district manager were given the combination to the safe.

There was eyewitness testimony tending to identify Henderson as the person who set the fire.[3] He presented an alibi defense.[4]

---

[3] On Sunday, August 24, Chapman worked at the station alone, and closed up as usual at 8 p.m. Loretta McGuire testified that she drove past the station twice that evening. Shortly after 8 p.m. she observed a black man pumping gasoline into a "beige-looking" car which she was "quite sure" was a hard top. Shortly before 11 p.m., she observed the same man pumping gas into the same car parked in the same position. At both times the station's interior lights were on.

Mrs. McGuire's testimony was substantially corroborated by her 12-year-old son, Jeffrey, who was in the car with her both times. Jeffrey said the car into which the gasoline was being pumped was a two-door model, "something like a Pontiac". At trial, neither Mrs. McGuire nor Jeffrey could identify Henderson as the man they had seen. They had identified him in a post-arrest line-up, but a lawyer associated with the Grand Rapids Defenders Office testified that Mrs. McGuire told him that, although she thought she recognized Henderson at the line-up, she did not feel confident saying so until she leaned over and looked at a slip of paper on which another witness had written Henderson's line-up number.

Martha Mekkes testified that as she was driving past the station between 1 and 1:30 a.m. on August 25, she saw flames shoot up from the back of the building. A gold-colored Pontiac driven by a black man then darted out from between the pumps and the building, nearly sideswiping her in the process. Ms. Mekkes identified Henderson's gold-colored Pontiac convertible as the car she had seen that night from a group of seven photographs shown her by defense counsel.

The police officer assigned to patrol the area in which the station was located observed a man walking away from the pumps at about 10:30 p.m. on August 24, carrying something which required the use of both hands. He drove past again, about 15 minutes later, and observed no one there. At approximately 1 a.m. he observed what appeared to be the same man on the station premises. At trial he identified Henderson as the man he had seen.

[4] Henderson testified that on Sunday the 24th he, Dorothy Starrs (with whom he was living), Dorothy's mother, and Leslie Sherman went to visit Dorothy's brother. They arrived back in Grand Rapids at about 8:30 p.m. and stopped first at Dorothy's mother's house. At

A split panel of the Court of Appeals reversed Henderson's conviction[5] on the basis of the following colloquy during cross-examination:

"*Q.* How was your financial situation back in August of 1975?

"*A.* Not bad.

"*Q.* How about not good?

"*A.* Not bad.

"*Q.* Didn't Consumers Power on July 28th, '75 turn off your power?

"*A.* Yes, they did.

"*Q.* Okay. Hadn't they turned it off once before in April?

"*A.* They did *not.*

"*Q.* They did not discontinue the service on April 4, 1975?

"*Mr. Howard [Defense Attorney]:* Your Honor, I am going to object to this line of questioning. I think it is improper under *People v Johnson,* 393 Mich 428 *[sic].*

"*The Court:* I am familiar with that case.

"*Mr. Zerial [Assistant Prosecuting Attorney]:* We are going to the intent. I think it is obvious as to what his financial condition is.

"*Mr. Howard:* The man's poverty or non-poverty is not in question in this trial.

"*Mr. Zerial:* That case I am familiar with, and that was a CCW case.

"*The Court:* No, that was the television case. That was that case where the television was on the back seat?

---

about 8:45, he, Dorothy and Leslie stopped at the home of Dorothy's father, Roy Sherman. At about 9:15, en route home, he stopped to check the station since he had not personally closed up that night, and then returned home. He fell asleep watching television, was briefly awakened by Warnell Martin, who visited shortly after 11, and then went to bed and slept until about 1:30 when he was awakened by a call from Roy informing him that the station was on fire. Henderson's testimony was corroborated by Dorothy, Roy and Warnell.

[5] *People v Henderson,* 80 Mich App 447; 264 NW2d 22 (1978).

"*Mr. Zerial:* Right.

"*Mr. Howard:* No, your Honor. It is a CCW case, and the Court says—

"*Mr. Zerial:* Just like I said.

"*Mr. Howard:* And the Court said—

"*The Court:* Well, I am familiar with either with that case or one like it.

"*Mr. Howard:* I really don't see the relevance either.

"*The Court:* Are you trying to show motive or what?

"*Mr. Zerial:* Yes, that case is entirely different.

"*The Court:* Well, let me say this to the jury. We are getting some testimony here about who is married and who isn't married, and who has kids legitimately and whose aren't, and who is having the power shut off, and who isn't. Now, those things are not in issue. I mean, the charge here is embezzlement of money, and the charge here is arson. Now, if the prosecutor is bringing this out to show motive, I will permit it, but only for that purpose. We are not charging anybody here with— I'd like to say sometimes this is a court of chancery not a court of chastity. So only for that purpose, and I would hope that you would restrict it as much as you can, Mr. Prosecutor.

"*Mr. Howard:* Your Honor, I would ask that the record reflect my objection.

"*The Court:* What?

"*Mr. Howard:* I would ask that the record reflect my objection.

"*The Court:* Yes, it will, and you may have your exception."

We granted leave to appeal limited to the issue "whether the trial court abused its discretion in permitting, over objection, prosecutorial cross-examination concerning the financial condition of defendant in an embezzlement case".[6]

---

[6] *People v Henderson*, 403 Mich 825; 267 NW2d 698 (1978).

## II

In *People v Johnson*[7] this Court reversed a conviction of carrying a concealed weapon because of cross-examination and argument based on the financial condition of the defendant.

Johnson was extensively cross-examined on various aspects of his background, including his poverty and unemployment. In closing argument, the prosecutor said:

"Think about it. There's a man with two cents in his pocket and he hasn't worked for a long time, there's three guns, three fully loaded weapons in the vehicle. That is something you can consider when you decide whether or not this defendant committed this particular violation."

We reversed Johnson's conviction, saying:

"Obviously neither poverty nor unemployment is an element of the crime of carrying a concealed weapon. Either a poor man or a rich man may be either guilty or innocent of carrying a concealed weapon. Likewise whether a man is employed or unemployed is no proof or partial proof of carrying a concealed weapon. * * * In short, these things neither in law nor in logic are evidence of defendant's guilt or innocence * * *."[8]

We found an abuse of discretion in allowing "inquiries designed to demonstrate a causal connection between extraneous matters and guilt on the charge."[9]

The Court of Appeals has subsequently ruled on the admissibility of evidence of a defendant's financial condition in diverse factual and procedural settings. The Court has not seen *Johnson* as announcing a per se rule that evidence of financial

---

[7] *People v Johnson,* 393 Mich 488; 227 NW2d 523 (1975).

[8] *Id.,* p 496.

[9] *Id.,* p 499.

condition is never admissible.[10] It has, however, been sensitive to the need to scrutinize the admission of such evidence because of its potential prejudicial impact, and has indicated awareness that decisions admitting such evidence might provide a precedent which would, in practice, weigh more heavily on the poor.[11]

In the instant case, the Court of Appeals, in holding the evidence inadmissible, said that it could not "permit routine proof of impecuniousness to establish the motive for a theft offense".[12] It concluded that the evidence was legally irrelevant because its probative value, which it found to be "very low",[13] was outweighed by its prejudicial

---

[10] See, e.g., People v Jackson, 77 Mich App 392, 400; 258 NW2d 89 (1977); People v Baldwin, 74 Mich App 700, 708; 254 NW2d 619 (1977); People v Thomas Jones, 73 Mich App 107, 109; 251 NW2d 264 (1976). But, cf. People v Andrews, 88 Mich App 115; 276 NW2d 867 (1979).

[11] See, e.g., People v Andrews, supra, p 118 ("Michigan courts have on several occasions deplored prosecutorial references to defendant's unemployment or poverty. * * * This Court refuses to 'assume that wealth exerts a greater attraction on the poor than on the rich.' To do so would 'effectively establish a two-tiered standard of justice and demolish pro tanto the presumption of innocence.' ") (citing the Court of Appeals decision in the instant case and People v Ronald Green, 74 Mich App 601; 254 NW2d 788 [1977]); People v LaForte, 75 Mich App 582, 584; 256 NW2d 44 (1977) ("[t]he prosecutor should be reminded, however, that there is no law against poverty, and that our system of justice will not countenance a modus operandi which effectively enacts such a law"); People v Thomas Jones, supra, p 109 ("In reaching our decision, we are mindful of the extreme prejudice that can be engendered by irrelevant questions relating to a defendant's poverty or unemployment"); People v Leverette, 84 Mich App 268, 271; 269 NW2d 559 (1978) ("Significantly, had defendant been employed, the prosecutor would not have been able to posit the disputed inference").

[12] People v Henderson, supra, 80 Mich App 453.

[13] Id., p 454. The Court explained:
"But though the poor may be moved by their need, those with greater income may respond to the pangs of insatiable avarice. We reject the assumption that 'easy money' is more alluring to the poor than to the prosperous.

\* \* \*

"The motive [for a theft offense] is so pervasive that its proving will establish little more than the defendant's typicality * * *."

effect on poor persons as a class. The Court found that this would be so even if it applied a rule that, on its face, did not discriminate against the poor:

"It may be argued that we should permit proof of the origins of each person's desire for money, whether it be want, or well-fed cupidity. However, greed would not readily be proved. Poverty would. Hence we cannot, consistent with equal treatment to the poor and the well-to-do, indulge ourselves in the fiction that the motive of each may be shown at trial."[14]

In his brief in this Court, Henderson echoes the Court of Appeals concern for avoiding class-based discrimination. Citing a New Jersey case, *State v Mathis*,[15] for the proposition that "there must be something more than poverty to tie a defendant into a criminal milieu", and a Federal case, *Davis v United States*,[16] for the proposition that "[w]here the evidence elicited only demonstrates that the defendant is 'poor,' the inquiry is improper", and arguing that admission of such evidence necessarily rests on the premise that "poor people have greater motive to commit theft crimes", Henderson warns that "[b]y allowing evidence of financial condition to be used to show motive in a theft offense, this Court would be permitting economic and social status to be routinely used against a defendant".

---

[14] *Id.,* p 454. Although not addressing the case by name, the Court was apparently responding to *People v Jackson, supra,* pp 400-401. The dissenting judge in *Henderson* quoted the following passage from *Jackson:*

"[W]e believe that, where a theft offense is involved, the prosecutor may prove a motive by showing that the defendant—whether poor or relatively affluent—was acutely short of money immediately before the offense occurred."

[15] *State v Mathis,* 47 NJ 455, 472; 221 A2d 529, 538 (1966).

[16] *Davis v United States,* 133 US App DC 167, 171; 409 F2d 453, 457-458 (1969).

We agree with the propositions quoted above from *Mathis* and *Davis.* There is a need to avoid undue prejudice in individual cases and to prevent establishment of a "two-tiered standard of justice"[17] weighing more heavily on the poor. And we recognize that evidence of a defendant's financial condition, because it ordinarily has limited probative value and usually goes to a collateral issue, will often distract rather than aid the jury.[18]

Our decision reversing the Court of Appeals does not, however, allow "routine use" of evidence of financial condition.

*Johnson,* and most of the post-*Johnson* Court of Appeals cases involving similar issues, concerned evidence that the defendant was unemployed and poor.[19]

The prosecutor's proofs in the instant case, rather than showing unemployment, established that Henderson was not only employed, but held a managerial position. The evidence that his electricity was shut off for non-payment, viewed in light

---

[17] *People v Ronald Green, supra,* p 606.

[18] See *People v Ronald Green (On Remand),* 79 Mich App 186, 188; 261 NW2d 253 (1977):

"We harbor this suspicion [that the admission of the evidence was not harmless] precisely because the prosecutor may have ' "divert[ed] the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law." ' *People v Farrar,* 36 Mich App 294, 299; 193 NW2d 363 (1971), quoting ABA Project on Standards for Criminal Justice, The Prosecution Function, Std 5.8(d)."

See also *People v Johnson, supra.*

[19] See *People v Andrews, supra; People v Thomas,* 86 Mich App 752; 273 NW2d 548 (1978); *People v Nelson,* 86 Mich App 651; 273 NW2d 512 (1978); *People v Leverette, supra; People v Williams,* 83 Mich App 642; 269 NW2d 251 (1978); *People v Osborne,* 75 Mich App 600; 256 NW2d 45 (1977); *People v Thomas Jones, supra.*

In *People v Baldwin, supra,* the evidence was that the defendant was employed, but earned only $50 per week; in *People v John Moore,* 78 Mich App 150; 259 NW2d 403 (1977), the Court did not describe the evidence, but characterized it as evidence of defendant's "financial and employment status".

of this evidence of employment, carried with it no suggestion that Henderson was "poor".

There is a difference between evidence of poverty and unemployment—evidence that a person is chronically short of funds—and evidence of the sort involved in this appeal, showing that a person is experiencing a shortage of funds that appears to be novel or contrary to what one would expect is typically felt by such a person.

Evidence of poverty, dependence on public welfare, unemployment, underemployment, low paying or marginal employment, is not admissible to show motive.[20] The probative value of such evidence is diminished because it applies to too large a segment of the total population.[21] Its prejudicial impact, though, is high. There is a risk that it will cause jurors to view a defendant as a "bad man"— a poor provider, a worthless individual.[22]

Other evidence of financial condition may, however, be admissible in the circumstance of a particular case.

Henderson was not charged with an ordinary theft offense such as larceny, robbery or breaking and entering. He was charged with embezzlement.

As the Court of Appeals observed in the instant case, "[t]he motive for a theft offense seldom requires explanation".[23] Motive in the typical case is a collateral issue of minimal importance.

Embezzlement, however, is not a typical theft offense. The embezzler, by definition, begins from a position of trust, and is usually gainfully em-

---

[20] Nor is such evidence admissible on a witness's credibility. See *People v Johnson, supra,* p 496.

[21] "The evidentiary value of circumstances establishing a motive that applies to an entire class or to a community is much less than when it affects the accused only." 1 Torcia, Wharton's Criminal Evidence (13th ed), § 172, p 320.

[22] *Cf. People v Hammond,* 394 Mich 627, 631; 232 NW2d 174 (1975).

[23] *People v Henderson, supra,* 80 Mich App 454.

ployed.[24] In the instant case, the evidence in the prosecution's case-in-chief unavoidably showed that Henderson was employed in a managerial position, that only Henderson and his district supervisor knew the combination to the service station safe, and that Henderson was the only person to have a key to the storeroom.

In these circumstances, the question of motive took on a significance not present in the typical theft case. Jurors may have wondered why Henderson, enjoying both gainful employment and his employer's trust, would breach that trust and risk losing his employment. In short, the motive for *this* theft offense "require[d] explanation".

Federal courts have referred to evidence of poverty to show motive as a "forbidden theme",[25] but have recognized that "the special nature of the crime charged may justify the use of evidence of financial embarrassment in order to show the accused's knowledge and motive, as where one is charged with embezzlement or similar financial misconduct".[26]

What marks embezzlement and similar offenses[27] is that the factual setting in which those crimes occur—a position of trust, gainful employment—

[24] Embezzlement is defined in MCL 750.174; MSA 28.371, as conversion or taking by an

"agent, servant or employee of another, or as the trustee, bailee or custodian of the property of another, or of any partnership, voluntary association, public or private corporation, or of this state, or of any county, city, village, township or school district within this state."

[25] *United States v Hernandez,* 588 F2d 346, 348 (CA 2, 1978), referring to a quotation from *State v Mathis, supra,* appearing in *United States ex rel Mertz v New Jersey,* 423 F2d 537, 542 (CA 3, 1970).

[26] *United States ex rel Mertz v New Jersey, supra,* p 541.

[27] Similar considerations might apply, for example, to acceptance of bribes by public officials, *United States v Polansky,* 418 F2d 444 (CA 2, 1969); and securities fraud, *United States v Houlihan,* 332 F2d 8 (CA 2, 1964), *cert den* 379 US 828 (1964).

generally causes one to wonder about the defendant's motive.[28]

This is not to say that evidence of a defendant's financial condition is admissible whenever embezzlement or a similar crime is charged, regardless of the nature of the evidence or the circumstances in which it is introduced. In this regard, we note that the testimony showing that Henderson's electricity had been shut off was not necessarily probative of an acute and seemingly atypical need for money at the time of the offense; mere financial embarrassment is not such a need. A judge may, in the exercise of discretion, bar evidence of financial embarrassment when persuaded that it is insufficiently probative of need. Henderson did not seek to invoke the judge's discretion in that regard.

We reverse the decision of the Court of Appeals and reinstate Henderson's convictions.

COLEMAN, C.J., and WILLIAMS, LEVIN, FITZGERALD, RYAN, and BLAIR MOODY, JR., JJ., concurred.

KAVANAGH, J. I dissent.

The principle embraced in *People v Johnson*, 393 Mich 488; 227 NW2d 523 (1975), should not be restricted. I would affirm the Court of Appeals for the reasons stated in the majority opinion of Judge CAVANAGH, 80 Mich App 447; 264 NW2d 22 (1978).

---

[28] Even in cases of other crimes for pecuniary gain, unique circumstances may render the need for such evidence real rather than pretextual, and the evidence therefore admissible.

See, *e.g.*, *United States v Caci*, 401 F2d 664 (CA 2, 1968), *cert den* 394 US 917 (1969), *rev'd on other grounds sub nom Natarelli v United States* in *Giordano v United States*, 394 US 310; 89 S Ct 1163; 22 L Ed 2d 297 (1969), involving a conspiracy to steal jewelry. The evidence of financial need was that the defendant, a night club entertainer, had written bad checks. Affirming the admission of the evidence, the Court of Appeals explained:

"The bad check evidence also tended to show that Caci lacked funds and thus had a motive to participate in the planned thefts. This has particular significance in view of the testimony from which the jury might have gathered that Caci was a highly paid entertainer."