PEOPLE v JENSEN

Docket No. 92199. Submitted April 15, 1987, at Lansing. Decided August 3, 1987.

Richard Jensen was convicted of making a false application for an automobile title, Eaton Circuit Court, Hudson E. Deming, J. Defendant appealed.

The Court of Appeals *held:*

1. The court erred in restricting the cross-examination of defendant's accomplice concerning the accomplice's financial situation at the time of the crime. Evidence of a temporary or unusual financial condition which might lead a person to engage in an economic crime may be admissible in appropriate cases. The defense theory was that the accomplice committed the crime. The testimony sought would have supported that theory. Where cross-examination of a prosecution witness has been unreasonably limited, amounting to an abuse of discretion and a denial of the right to confrontation, a conviction based on that testimony should not be sustained.

2. The trial court did not err in failing to include intent to fraudulently pass title in his instructions on the elements of the crime of making a false application for a title. The prosecutor did not abuse his discretion in charging defendant with making a false application for title rather than intentionally altering a certificate of title.

3. The trial court erred in allowing the jury to determine whether the main witness against defendant was an accomplice. The error requires reversal even though no objection was

REFERENCES

Am Jur 2d, Criminal Law §§ 956 *et seq.*

Am Jur 2d, Evidence § 291.

Am Jur 2d, Trial §§ 690, 818-820, 866.

Am Jur 2d, Witnesses §§ 472, 475, 479, 507, 517.

Necessity of, and prejudicial effect of omitting, cautionary instruction to jury as to accomplice's testimony against defendant in federal criminal trial. 17 ALR Fed 249.

Propriety of specific jury instruction as to credibility of accomplices. 4 ALR3d 351.

made, since the trial was essentially a credibility contest between the defendant and the accomplice.

Reversed and remanded.

1. CRIMINAL LAW — EVIDENCE — FINANCIAL CONDITION.

Evidence of a temporary or unusual financial condition which might lead a person to engage in an economic crime may be admissible in appropriate cases.

2. CRIMINAL LAW — CROSS-EXAMINATION — RIGHT OF CONFRONTATION — APPEAL.

The scope of cross-examination is a matter left to the trial court's discretion, which must be exercised with due regard for a defendant's constitutional rights; where cross-examination of a prosecution witness has been unreasonably limited, amounting to an abuse of discretion and a denial of the right to confrontation, a conviction based on that testimony should not be sustained.

3. CRIMINAL LAW — AUTOMOBILES — FALSE APPLICATION FOR TITLE — INTENT.

A trial court does not err in failing to include intent to fraudulently pass title in his instructions on the elements of the crime of making a false application for a title.

4. PROSECUTING ATTORNEYS — CHARGING FUNCTION.

A prosecutor may properly charge a defendant under a more general statute rather than a more specific statute where the general statute contains an element not found in the more specific statute.

5. CRIMINAL LAW — WITNESSES — ACCOMPLICES — JURY INSTRUCTIONS — APPEAL.

It is error requiring reversal for a trial court to refuse to instruct, upon request, on the inherent unreliability of accomplice testimony or to fail to give the correct accomplice instruction, whether requested or not, where the issue is closely drawn; the issue is closely drawn where the trial is essentially a credibility contest between the defendant and the accomplice.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *G. Michael Hocking,* Prosecuting Attorney, and *David J. Wallace,* Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Peter Jon Van Hoek*), for defendant on appeal.

Before: CYNAR, P.J., and SHEPHERD and B. A.
JASPER,* JJ.

SHEPHERD, J. After a jury trial, defendant Richard Jensen was convicted of making a false application for an automobile title, MCL 257.254; MSA 9.1954. Defendant appeals as of right. We reverse and remand for a new trial.

The prosecutor alleged in his opening statement that defendant made two misrepresentations to the Secretary of State in his April 29, 1985, application for transfer of title of a 1984 Chevrolet Camaro. The first alleged misrepresentation was that the title had no lien on it, when in fact there was an outstanding security interest to the General Motors Acceptance Corporation. The second alleged misrepresentation was that the owner of the car intended to transfer title to defendant on April 29, 1985, when in fact he did not.

Leora Doty, of the Secretary of State's office in Windsor Township, Eaton County, Michigan, testified that defendant applied for transfer of title on the car on April 29, 1985. Doty's office was authorized to give a quick title for a car after checking the relevant information. After reviewing the existing title on the car, however, she went to her supervisor because she felt that the GMAC termination information on the face of the title looked unusual. On cross-examination, Doty stated that defendant readily gave her his driver's license when she asked him for identification.

Robert Hodges, Doty's supervisor, testified that his office could only issue a quick title if all liens on the existing title had been validly terminated. He was suspicious of the discharge of GMAC's lien on the face of the title because GMAC usually used

* Recorder's Court judge, sitting on the Court of Appeals by assignment.

a stamp and this discharge appeared to be typed. Hodges called GMAC and was told that the lien on the car had not been discharged. Hodges then called the police. Hodges did not recall if defendant had a certificate of insurance with him. He stated that defendant offered no explanation about the lien. On cross-examination, however, Hodges acknowledged that defendant appeared surprised when he was questioned about the lien discharge. Defendant was cooperative and gave Hodges no difficulty.

Michael Gotshall, a Michigan State Police trooper, responded to Hodges' call. According to Officer Gotshall, defendant told him that he purchased the car on March 22, 1985. Officer Gotshall stated that defendant said there must have been a mistake made by GMAC or by the prior owner of the car, and that defendant did not appear to be very concerned about the situation. Officer Gotshall confiscated the title. He did not recall defendant asking for a copy of the title or for a receipt for the confiscated title.

David Bart testified that he was the titleholder of the 1984 Camaro. He purchased the car in 1984 and financed it through payroll deductions from his job with General Motors. As of April, 1985, he owed about $9,800 on the car.

Bart testified that he agreed to sell the car to defendant on April 12, 1985. Bart acknowledged that at the preliminary examination he had stated that the date of the agreement was April 26. He then asserted that the 12th was the correct date. He had known defendant for eight or nine months, having met him in a bar that Bart frequented. According to Bart, the agreement was made at defendant's house with only the two of them present. The terms were a purchase price of $10,000, payable at $2,000 a month for five months. Defen-

dant was also to give Bart a 1971 Plymouth that he owned. Bart stated that he received no money on April 12, but that they exchanged the two cars. Later that day, he went to defendant's insurance agent for a copy of defendant's insurance certificate on the Camaro.

Bart testified that on April 28 he dropped off the Camaro title in defendant's mailbox. He stated that he and defendant had talked over the situation and that he had agreed to give defendant the title as a showing of good faith. Bart stated that he had not typed anything on the title before giving it to defendant. He denied writing a sales price of $8,000 or a sales date of March 22 on the title. He acknowledged signing the title in August, 1984, when he had previously tried to sell the car, but denied putting any writing on the title other than his signature.

According to Bart, defendant called him on May 1 and told him the police had taken the title. He met defendant that day. Defendant told him they could both get into a lot of trouble and that if he was questioned by the police he should tell them that someone else had discharged the lien on the title before he gave it to defendant. Bart admitted telling the police that a man he met in a bar had agreed to sign that the lien had been discharged. He stated that he was afraid that he would get into trouble, so he lied to the police. Bart testified that the car was eventually repossessed and sold. He still owed $2,100 to $2,400 on the car. Bart acknowledged that he had been charged with forging a title and knowingly possessing a forged title and that the charges had been reduced to a misdemeanor in a plea bargain exchange for his testimony against defendant. He had not yet been sentenced.

On cross-examination, Bart testified that he had

told the police that the car's selling price was $10,000. He denied that defendant had in fact paid him $8,000 for the car. At the time of the preliminary examination, Bart had been suspended from his job for disciplinary reasons. He was not current on his car payments as of April 12. He stated that he returned the 1971 Plymouth to defendant in August because he could not afford insurance on the car. He also told defendant that he had a bad driving record and could not afford the insurance on the Camaro. Bart indicated that he intended to file for bankruptcy in light of the remaining money that he owed on the car. When defense counsel asked about other reasons why he might be intending to file for bankruptcy, the prosecutor objected on grounds of relevancy. The trial court sustained the prosecutor's objection to any further questions on Bart's financial situation and on his intent to file for bankruptcy.

Jack Heeres, an insurance agent for Allstate, testified that on April 12, 1985, he spoke to defendant and discussed adding the Camaro to defendant's insurance. Later that day he gave a copy of the proof of insurance to a man who came to his office. According to Heeres, defendant told him on April 12 that there was no lien on the car.

Philip Monterusso, from GMAC, stated that his company normally discharges a lien by using a rubber stamp and a signature of a GMAC agent. The Camaro title had not been discharged in this normal fashion. Monterusso could not identify the signature on the title, which appeared to read "Bob Woodward" or "Bob Wentworth," as that of anyone who worked at the GMAC Grand Rapids office which serviced Bart's account. Monterusso testified that he spoke to Bart on May 28, 1985. At that time, Bart stated that he was in the process of selling the car, that the police had confiscated

the title, that he intended to pay off the lien when the title was released, and that defendant had the car.

Michigan State Police Detective Robert Golm interviewed defendant at his home on May 8, 1985. Detective Golm testified that defendant said that he had agreed to pay Bart $8,000 for the car, but had not given him any cash yet. He told Golm he was going to pay Bart when he got clear title. Defendant also stated that he received the title from Bart personally on April 27. Defendant stated that he was not sure if he had filled out the information on the back of the title concerning the purchase price and mileage of the car. Defendant denied making the discharge of the lien, stating that it was already on the title when he received it.

On May 7, Detective Golm talked to Bart, who told him that a man he met in the bar who identified himself as a GMAC employee had told him he could get a clear title if he paid off the lien within ten days. Bart told him that the car was sold for $8,000. On June 13, Bart told Detective Golm that he had agreed to sell the car to defendant for $10,000 and the Plymouth.

The first defense witness was John Koval, who stated that he worked the same shift as Bart and was somewhat acquainted with him. One night at a card game with other people from work, Bart mentioned that he wanted to sell the Camaro. Koval stated that Bart had mentioned a price in the range of $8,000 to $9,000. A few weeks later, Koval approached Bart about the car and was told that he had already sold it. When Koval asked Bart if he had already gotten the money for the car, Bart responded "Yeah, it's gone." At the preliminary examination, however, Koval had testified that defendant had not paid Bart. Koval

indicated that he was an acquaintance of defendant and had known him for around one year.

Defendant testified that he had known David Bart for around one year. In early April, 1985, he was at a card game where Bart and John Koval were present and overheard them discuss Bart's Camaro. About one week later, he told Bart that he would buy the car for $8,000. Defendant denied that he had ever agreed to pay $10,000 in monthly installments. Defendant testified that he reached an agreement with Bart on April 12. He took possession of the car and obtained insurance, but did not pay Bart the purchase price then as he needed more time to get the full $8,000. Defendant testified that he had sold a different car in February, 1985, for $5,800 and had used this money to purchase the Camaro. He gave Bart the money on April 26 and received the title from Bart.

Defendant testified that the lien had been discharged on the title when he received it from Bart but he did not know who had placed the discharge there. When the title was confiscated at the Secretary of State's office on April 29, he asked for and received a copy of it as a receipt.

On cross-examination defendant stated that he has bought and sold cars for profit and as a hobby. He denied telling Officer Gotshall that he bought the car on March 22. He also denied telling Detective Golm on May 8 that he would pay Bart only when he got clear title, telling Golm instead that he paid Bart when he received the title. He acknowledged telling the insurance agent on April 12 that there were no liens on the car.

Defendant raises three issues. We agree with defendant that the trial judge abused his discretion in sustaining the prosecutor's objection to defense counsel's cross-examination of David Bart. The foreclosure of testimony concerning Bart's

financial status denied defendant his right to confrontation. This error was not harmless, given the critical nature of Bart's testimony and the importance of his credibility to the prosecution's case.

The defense theory at trial was that David Bart, anticipating receiving $8,000 in cash from selling the Camaro, failed to pay off the outstanding balance of the GMAC loan and instead either personally or through an accomplice falsified the discharge on the face of the title before delivering the title to defendant. During the prosecution's case, evidence came out that even with the eventual repossession and sale of the car by GMAC, Bart still owed approximately $2,400 on his loan. During cross-examination of Bart, he was asked how he was going to repay that loan. He indicated that he was intending to file for bankruptcy. Later, defense counsel sought more information about Bart's intention to file for bankruptcy.

Generally, evidence of poverty or unemployment is inadmissible to prove a motive for a larceny offense. *People v Johnson,* 393 Mich 488, 496-497; 227 NW2d 523 (1975). The Supreme Court recognized an exception to this general rule, however, in *People v Henderson,* 408 Mich 56, 66-68; 289 NW2d 376 (1980). In *Henderson,* the defendant was a gas station manager who was prosecuted for arson of and embezzlement from the station he managed. During trial, the prosecution was permitted to question the defendant about his financial condition around the time of the fire and embezzlement. This Court reversed, but the Supreme Court reinstated the conviction, holding that evidence of temporary or unusual financial conditions which might lead a person to engage in an economic crime could be admissible in the circumstances of a particular case.

In the instant case, the court's decision to fore-

close inquiry into the possible reasons for Bart's declaration of bankruptcy was error. Bart testified that he had worked for GM for seven years and was still employed by them. This was not a case where the defense was trying to show poverty or unemployment as a motive for Bart to have kept the $8,000 which defendant alleged that he paid Bart. As in *Henderson,* the inquiry was about a temporary or unusual shortage of funds that might have caused an otherwise gainfully employed person to resort to an economic crime. Bart acknowledged that he had been suspended by GM for disciplinary problems and that he had encountered trouble paying for insurance on the Camaro. The GMAC records indicated that he was eight weeks in arrears on his loan payments before the agreement with defendant. All of this suggests that Bart could have had other problems which would lead him to declare bankruptcy. The existence of other financial difficulties would have strongly supported the defense theory that Bart kept the $8,000 and falsified the title.

The scope of cross-examination is a matter left to the trial court's discretion, which must be exercised with due regard for a defendant's constitutional rights. If cross-examination of a prosecution witness has been unreasonably limited, amounting to an abuse of discretion and a denial of the right to confrontation, a conviction based on that witness' testimony should not be sustained. Reversal is not required, however, where the error is harmless or no prejudice results. *People v Holliday,* 144 Mich App 560, 566-567; 376 NW2d 154 (1985). The error in the instant case cannot be considered harmless. While defense counsel argued in his closing argument that Bart was two months behind in payments at the time of the offense and that Bart later declared bankruptcy, he was un-

able to introduce by another method Bart's other financial difficulties at the time of the offense. These difficulties would have bolstered a crucial element of the defense theory. Since Bart's testimony was, realistically, the only evidence against defendant, its importance should not be underrated. Accordingly, reversal is required.

With regard to defendant's second issue, we agree with the prosecutor that the trial judge did not err by failing to include intent to fraudulently pass title as an element of making a false application for title, MCL 257.254; MSA 9.1954. Intent is not included as an element in the statute, but can be inferred from the other necessary elements. Moreover, the statute is distinguishable from MCL 257.222(6); MSA 9.1922(6), another provision of the Michigan Vehicle Code involving forged certificates of title. Therefore, defendant was properly charged under MCL 257.254; MSA 9.1954, and the proper elements were read to the jury.

MCL 257.254; MSA 9.1954 provides:

Any person who shall knowingly make any false statement of a material fact, either in his application for the certificate of title herein provided for, or in any assignment thereof, or who, with intent to procure or pass title to a motor vehicle which he knows or has reason to believe has been stolen, shall receive or transfer possession of the same from or to another, or who shall have in his possession any motor vehicle which he knows or has reason to believe has been stolen, and who is not an officer of the law engaged at the time in the performance of his duty as such officer, shall be deemed guilty of a felony and upon conviction shall be punished by a fine of not more than $5,000.00 or by imprisonment in any penal institution within the state for not more than 10 years, or both, in the discretion of the court. This provision shall not be exclusive of any other penalties

prescribed by any law for the larceny of the unauthorized taking of a motor vehicle.

Defendant was charged under the first clause of the statute with making false statements of material fact in an application for a certificate of title. The prosecution alleged that defendant falsified the lien discharge on the title and falsely represented to the Secretary of State that David Bart intended, at that time, to transfer the vehicle to defendant.

The trial judge instructed the jury:

> The Defendant is charged with the crime of making a false statement about the title on a motor vehicle. Any person who knowingly makes a false statement of a material fact in applying for or in the assignment of a Certificate of Title on a motor vehicle is guilty of this crime.
>
> The Defendant pleads not guilty to this charge. To establish this charge the Prosecution must prove each of the following elements beyond a reasonable doubt: First, that the Defendant applied for a Certificate of Title to a motor vehicle.
>
> Second, that in so doing the Defendant made a false statement of a material fact. A material fact means an essential matter required for a valid transfer.
>
> And, third, that the Defendant made the statement knowing it to be false.

The court gave no instruction on intent in regard to the charged offense. The trial court also instructed the jury on the lesser included offense of attempted false application for title, however, indicating that the prosecution must prove that the defendant had the specific intent to falsely apply for title.

Defendant argues that the element of intent to fraudulently pass title should be read into the

offense of making application for false title, and therefore that the jury should have been instructed on it. Defendant cites *People v Morton,* 384 Mich 38; 179 NW2d 379 (1970), in support of his proposition. In *Morton,* the Supreme Court considered a challenge to the third clause of MCL 257.254; MSA 9.1954, which on its face makes the knowing possession of a stolen motor vehicle a violation of the statute. The *Morton* Court ruled that, since the Michigan Vehicle Code concerns the validity of transfers of title, mere possession of a stolen car without an intent to fraudulently transfer title of that car would not validly fall within the Michigan constitutional requirement that legislation cannot embrace more than one object. Const 1963, art 4, § 24. The *Morton* Court concluded that the third section of the statute must be treated as surplusage, or deleted from the legislation as inconsistent with the statute's intent. 384 Mich 41. The statute has not been amended, and later courts have required that an intent to fraudulently pass title be shown in addition to the requirement of possession of a stolen car.

Defendant argues that, while the *Morton* ruling reached only the clause concerning possession of a stolen car, its reasoning should apply equally to the first clause. We do not agree. While intent to fraudulently pass title cannot be inferred from mere possession of an automobile, intent is almost always the necessary inference when a defendant knowingly makes a false statement of a material fact in an application for certificate of title. As indicated in the instructions, a material fact means "an essential matter required for a valid transfer." Failure to include intent as a necessary element of the first clause of MCL 257.254; MSA 9.1954 would not make that clause unconstitu-

tional as embracing more than one object, unlike *Morton.* Since intent is not, and need not be, a separate element of the clause, the court did not err by failing to include it in the jury instructions.

Defendant also argues that, if the element of specific intent to fraudulently pass title is not read into MCL 257.254; MSA 9.1954, that statute will be indistinguishable from another section of the Vehicle Code, MCL 257.222(6); MSA 9.1922(6), which reads:

> (6) A person who intentionally reproduces, alters, counterfeits, forges, or duplicates a certificate of title or who uses a reproduced, altered, counterfeited, forged, or duplicated certificate of title shall be punished as follows:
>
> (a) If the intent of reproduction, alteration, counterfeiting, forging, duplication, or use was to commit or aid in the commission of an offense punishable by imprisonment for 1 or more years, the person committing the reproduction, alteration, counterfeiting, forging, duplication, or use is guilty of a misdemeanor, punishable by imprisonment for a period equal to that which could be imposed for the commission of the offense the person had the intent to aid or commit. The court may also assess a fine of not more than $10,000.00 against the person.
>
> (b) If the intent of the reproduction, alteration, counterfeiting, forging, duplication, or use was to commit or aid in the commission of an offense punishable by imprisonment for not more than 1 year, the person committing the reproduction, alteration, counterfeiting, forging, duplication, or use is guilty of a misdemeanor, punishable by imprisonment for not more than 1 year, or a fine of not more than $1,000.00, or both.

We find the statutes distinguishable. Defendant argues that his alleged conduct also falls within the confines of this statute, however, which would

punish his conduct as a misdemeanor. Defendant contends that, when two statutes appear to conflict, the specific statute enacted after the more general statute applies, and his crime should have been charged under MCL 257.222(6); MSA 9.1922(6), which is the more recently enacted statute.

Defendant's argument must fail. Generally a prosecutor has broad discretion in choosing under which of two applicable statutes to prosecute. *Genesee Prosecutor v Genesee Circuit Judge,* 386 Mich 672, 683; 194 NW2d 693 (1972). When two statutes appear to conflict, the more specific statute enacted after the more general statute prevails. *People v McFadden,* 73 Mich App 232, 235; 251 NW2d 297 (1977). However, where the more general statute contains an element not found in the more specific statute, the prosecutor can properly proceed under the more general statute. In *People v Ford,* 417 Mich 66, 82-83; 331 NW2d 878 (1982), the Supreme Court found that the defendant could properly be charged with uttering and publishing, although the facts of his case also showed that he could have been charged with misuse of a credit card. Uttering and publishing requires a forgery which could be done through misusing a credit card; however, misuse of a credit card does not necessarily require a forgery. In the instant case, to show the crime of false application for title under MCL 257.254; MSA 9.1954, the prosecutor must show that defendant applied for a certificate of title and that he knowingly made a false statement of a material fact. A violation of MCL 257.222(6); MSA 9.1922(6) does not necessarily require any of these elements. Therefore, the prosecutor could properly proceed under MCL 257.254; MSA 9.1954.

Finally, with regard to defendant's third issue,

we hold that the trial court erred in failing to give the *proper instruction* on accomplice testimony. Since David Bart pled guilty to possession of an altered title in exchange for his testimony, the trial court should have instructed the jury that he was an accomplice. Instead, the trial court allowed the jury to determine whether or not Bart was an accomplice. Defendant's failure to request the proper instruction, or to object to the instruction given, does not preclude reversal, as the factual issue in the instant case was closely drawn.

In the instant case, the trial court instructed the jury based on CJI 5:2:02, entitled "Witness a Disputed Accomplice":

> I wish to caution you concerning the testimony of David A Bart. First, you must decide whether or not David A Bart himself had a part in committing the crime with which the Defendant is charged. Although David A Bart did not admit his own involvement, other evidence could lead you to believe otherwise. A person who knowingly and voluntarily cooperates or aids another in committing a crime is called an accomplice.
>
> An accomplice is someone who knowingly, voluntarily, and purposely joins with another in performing an illegal act. You must first determine whether David A Bart is an accomplice.
>
> If after considering all the evidence you conclude that David A Bart did not participate in the crime, then you should consider his testimony the same as any other witness. But, if you conclude that David A Bart did act as an accomplice, then you must consider the testimony in the light of the following instruction.

The court then instructed the jury using CJI 5:2:03 ("Cautionary Instruction Regarding Accomplice Testimony") that it should treat the testimony of an accomplice with care and caution, taking into

account, among other factors, whether the accomplice has been offered any reward or inducement for his testimony. The court specifically mentioned the plea agreement for Bart's testimony:

> Now, as I remember, in Kent County Mr. Bart was charged with a crime which was reduced to a misdemeanor if he testified against Mr. Jensen in this case.

The trial court erred in instructing the jurors that they were to make a factual determination of whether Bart was an accomplice. Bart admitted on direct examination that he was originally charged with forging a certificate of title and knowingly possessing a forged title. He also testified that he pled guilty to possession of a false or altered title in exchange for his testimony against defendant, but had not yet been sentenced. Through Bart's own admissions and his guilty plea to a reduced charge arising from the incident, his status as an accomplice was beyond dispute. Accordingly, the jury should not have been given the opportunity to find that he was not an accomplice, with the result that his testimony would be treated with no greater care or caution than that of any other witness. Proper instruction was especially necessary in the instant case, since Bart testified that the title was falsified only after he gave it to defendant. Bart's guilty plea to possession of a false title, in addition to undermining his credibility, directly contradicted his trial testimony.

The trial court should have instructed the jury using CJI 5:2:01 ("Witness an Undisputed Accomplice") which together with its use note reads:

> NOTE: Use CJI 5:2:02 if accomplice status is disputed.

[*Name witness*] claims that he took part in committing the crime with which the defendant is charged. [(*Name witness*) has already been convicted of charges arising out of the commission of that crime.] [The evidence clearly indicates that (*name witness*) is himself guilty of the same crime with which the defendant is charged (and/or) has been granted immunity.] Such a witness is called an accomplice.

USE NOTE: This instruction is to be followed by the instruction on weighing testimony of an accomplice, CJI 5:2:03.

This charge should be given automatically where the witness has admitted his guilt or has been convicted of the crime, or where the evidence clearly indicates his complicity. Strike out whichever of the parenthesized statements is inapplicable. Of course, more than one may apply.

In certain classes of cases (e.g., consensual statutory rape), the victim as a matter of law is not considered to be an accomplice. In those cases, the defendant is not entitled to the charge on accomplice testimony.

This instruction would have informed the jury that Bart was an accomplice and that his testimony should be treated accordingly.

In *People v McCoy*, 392 Mich 231, 236-238; 220 NW2d 456 (1974), the Supreme Court discussed the inherent unreliability of accomplice testimony and a defendant's right to a cautionary instruction regarding such testimony. The Court ruled that, after the publication of *McCoy*, it would be error requiring reversal to fail to give such a cautionary instruction if requested and may be error requiring reversal even without a request "if the issue is closely drawn." *Id.,* p 240. The issue is "closely drawn" if the trial is essentially a credibility contest between the defendant and the accomplice. *People v Fredericks,* 125 Mich App 114, 120-121; 335 NW2d 919 (1983). In the instant case, the

factual issues were "closely drawn" as the testimony boiled down to a credibility contest between defendant and David Bart. Therefore, failure to give any accomplice instruction would have been error requiring reversal even absent a request. In the instant case, the trial court did not fail to give *any* accomplice instructions; rather, it gave the *wrong* one. It is not clear whether defendant requested the incorrect instruction, although he did not object to it once it was given. The question therefore becomes: if the issue is closely drawn, does it require reversal where the trial judge failed to give the *correct* accomplice instruction and no objection was made to the incorrect one?

We hold that failure to give the correct accomplice instruction sua sponte under the circumstances of this case, where the issue was closely drawn, was error requiring reversal. If accomplice testimony is inherently suspect, and if it is the only real evidence which directly contradicts the defendant's testimony, it is extremely important that the jury weigh it properly. Allowing the jury to find that the witness was not an accomplice, when in fact he was, should not be permitted. Proper weighing of accomplice testimony in close situations is so important that the trial court should be required sua sponte to give correct instructions under circumstances such as these.

As defendant notes, failing to give proper accomplice instructions where a credibility contest exists is similar to giving a factually incorrect instruction on a material matter, *People v Townes,* 391 Mich 578, 592-594; 218 NW2d 136 (1974), or failing to instruct adequately on the defense theory where the theory is an essential ingredient of the case, *People v Ora Jones,* 395 Mich 379, 394; 236 NW2d 461 (1975); *People v St Cyr,* 392 Mich 605, 609-610; 221 NW2d 389 (1974). Neither of these situations

requires an objection for error requiring reversal to be found. Since the trial court improperly instructed the jury on accomplice testimony, this Court must reverse.

In summary, the trial court erred in foreclosing questioning about David Bart's financial status. The trial court did not err by failing to instruct the jury that defendant had to have a specific intent in order to fraudulently pass title. The trial court erred by submitting to the jury the issue whether witness David Bart was an accomplice, where Bart had pled guilty to a lesser included offense.

Reversed and remanded for a new trial.