*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

BRITTNY LEE FULWYLIE,

Defendant-Appellant.

UNPUBLISHED
May 21, 2020

No.  344343
Macomb Circuit Court
LC No.  2017-002730-FC

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DONALD JARELL ROBINSON,

Defendant-Appellant.

No.  344445
Macomb Circuit Court
LC No.  2017-002729-FC

Before:  RIORDAN, P.J., and JANSEN and STEPHENS, JJ.

PER CURIAM.

In Docket No. 344445, defendant Donald Jarell Robinson appeals as of right his jury convictions for first degree murder, MCL 750.316; felony murder, MCL 750.316(1)(B); armed robbery, MCL 750.529; felon in possession of a firearm, MCL 750.224f; and two counts felony firearm, MCL 750.227b.  Robinson was sentenced as a third offense habitual offender to terms of life imprisonment without parole for the murder convictions, 23 to 50 years 'imprisonment for the armed robbery conviction, 2 to 10 years 'imprisonment for the felon in possession of a firearm conviction, and 2 years 'imprisonment on his two felony firearm convictions.

-1-

In Docket No. 344343, defendant Brittney Lee Fulwylie appeals as of right her jury convictions for first-degree murder, MCL 750.316; felony murder, MCL 750.316(1)(b); and armed robbery, MCL 750.529. Fulwylie was sentenced to life without parole for the murder convictions and 17 to 50 years 'imprisonment for the armed robbery conviction.

In both appeals, we affirm in part, vacate in part and remand for correction of the Judgment of Sentence.

## I. BACKGROUND

Defendants' convictions arise from the shooting death of Marcus Samuel, aged 37, on March 27, 2017, at approximately 10:00 p.m. at his home at 23534 Stewart in Warren, Michigan. At the time, Samuel and defendant Fulwylie were in a dating relationship. On the evening of the incident, Samuel made a 911 call around 9:50 p.m. from a party store near his home. Samuel told police that he was watching his home surveillance system from his cellular phone and overheard his girlfriend, Fulwylie, talking to a third party about a plan to rob him. The 911 operator urged Samuel to stay at the party store and not return home, but he disregarded that advice. At 10:02 p.m., officers responded to a dispatch for shots fired at 23524 Stewart where they found Samuel on the ground and unresponsive. Two neighbors, Jessica Kobel and Charles Shaw, reported that they heard gunshots, and saw Samuel laying in the street as an unknown male suspect ran through their front yard toward a running vehicle. Kobel and Shaw believed the waiting vehicle was a silver sedan, driven by a woman who yelled to the suspected male "get in nigga, get in" before the two of them sped off. Fulwylie's mother let her daughter into their home shortly after 10:00 p.m. and noticed co-defendant Robinson waiting outside. Fulwylie's mother observed her daughter's vehicle, a blue 2008 Chrysler Sebring, and another vehicle unknown to her, a bright cobalt blue car, parked on the street in front of the home.

Fulwylie was identified from Samuel's home surveillance equipment, and was arrested the following day, on March 28, 2017. A number of items were found in her vehicle at the time of her arrest including: purchase documents for a .40-caliber handgun, several .40 caliber bullets, an empty gun-case, and a 36th District Court eviction order dated in January 2017, with both her and co-defendant Robinson's names listed as defendants. When the address on the notice was searched pursuant to warrant, the police found another of Fulwylie's guns. Robinson was arrested during a traffic stop on March 30, 2017. Both defendants' cellphones were seized.

Defendants were charged with first-degree premeditated murder, felony murder, and armed robbery. Robinson was additionally charged with two counts of felony firearm and felon in possession of a firearm. The district court declined to bind either defendant over on the charges of armed robbery, felony murder, and one count felony firearm stating that there was no evidence of an actual robbery where Samuel was found still having his valuables on his person. Those charges were reinstated when the circuit court granted the prosecutor's motion to amend the information. Defendants were subsequently found guilty of all counts by a jury.

On appeal, both defendants challenge the sufficiency of the evidence to convict them and the amendment of the information. They also argue that their convictions for both first-degree murder and felony murder violated double jeopardy. Defendant Fulwylie separately challenges several issues:

1. Admission of Officer Brandon Roy's expert cellphone tower testimony,
2. Admission of Samuel's recorded 911 call,
3. Denial of her motion to introduce testimony as to Samuel's habits, and
4. Prosecutorial misconduct that denied her a fair trial.

Defendant Robinson individually challenges the trial court's flight instruction to the jury.

## II. AMENDING THE INFORMATION

### A. STANDARD OF REVIEW

"A trial court's decision to grant or deny a motion to amend an information is reviewed for an abuse of discretion." *People v McGee*, 258 Mich App 683, 686–687; 672 NW2d 191 (2003). "The trial court abuses its discretion when its decision falls outside the range of principled outcomes." *People v Perry*, 317 Mich App 589, 594; 895 NW2d 216 (2016).

### B. ANALYSIS

In cases where the district court has dismissed some but not all of the charges originally brought, the prosecution may seek circuit court review of the magistrate's findings by filing a motion to amend the information. *People v Goecke*, 457 Mich 442, 458; 579 NW2d 868 (1998). "Jurisdiction having vested in the circuit court, the only legal obstacle to amending the information to reinstitute an erroneously dismissed charge is that amendment would unduly prejudice the defendant because of unfair surprise, inadequate notice, or insufficient opportunity to defend." *Id*. at 462 (citation marks and citation omitted); MCR 6.112(H). "In reviewing the bindover decision, a circuit court must consider the entire record of the preliminary examination and may not substitute its judgment for that of the district court." *People v Henderson*, 282 Mich App 307, 312-313; 765 NW2d 619 (2009). "Where a preliminary examination is held on the very charge that the prosecutor seeks to have reinstated, the defendant is not unfairly surprised or deprived of adequate notice or a sufficient opportunity to defend at trial...." *Goecke*, 457 Mich at 462.

The defendants' arguments on this issue are not persuasive. The trial court applied the appropriate analytical framework when it granted the amendment of the information. Defendants were not unfairly surprised, deprived of adequate notice or a sufficient opportunity to defend against the reinstated charges when a joint preliminary examination on the same charges was held on July 25, 2017. Further, defendants had sufficient time to defend against the reinstated charges when the circuit court granted the prosecutor's request to amend the information in September 2017 and trial did not begin until April 2018.

We agree with the trial court that the district court's refusal to bind defendants over on felony murder, armed robbery and one count of felony firearm, was an abuse of discretion. Samuel's 911 call indicated that he had left a young woman named Brittny in his house at 23524 Stewart Lane while he went to buy something to drink, and that he was watching her on his phone by way of his in-home surveillance system. He reported that he could hear Brittny tell someone on the phone that he (Samuel) would be home soon and that when he returned, the other person on the phone was to "just walk him in" where "the shit" is. Samuel told the 911 operator that he understood "walk him in" as slang for pulling a gun on someone. Defendants' cell phone tower records for the period that Fulwylie was in Samuel's home showed Fulwylie was calling a number registered to Robinson, and that Robinson's phone was in the area of Stewart Lane when it received

-3-

the call. Officer David Rexford (Rexford) testified that he received a dispatch for shots fired at 23524 Stewart Lane and when he arrived, Samuel was lying in the street. Dr. Daniel Spitz (Spitz) testified that Samuel died from gunshot wounds. During the autopsy, Spitz recovered $686.27 in cash, a watch, necklaces, and various pendants from Samuel's person. Fulwylie's prior coworker Marquise Copeland testified that months earlier Fulwylie had told him that she and her boyfriend were planning to lure men into hotel rooms to rob them. Copeland also testified that when he told Fulwylie the plan was not a good idea, Fulwylie said she would never do it.

The inference could be drawn from Samuel's and Fulwylie's phone calls that Fulwylie and Robinson planned to rob Samuel when he returned home. It could further had been inferred from Samuel's cause of death that his robber was armed. The robbery not having been completed was not a proper basis to refuse to bind the defendants over on the charges of armed robbery. An "attempted armed robbery with an incomplete larceny is . . . sufficient to sustain a conviction under the . . . armed robbery statute[.]" *People v Williams*, 491 Mich 164, 172; 814 NW2d 270 (2012). Further, " 'in the course of committing a larceny' includes acts that occur in an attempt to commit the larceny, or during commission of the larceny, or in flight or attempted flight after the commission of the larceny, or in an attempt to retain possession of the property." MCL 750.350(2). Notably, neither defendant disputes the district court's bind over decision on first-degree premeditated murder that identified them as the persons who murdered Samuel. The court's identification finding therefore would equally apply to identification of the persons who committed any robbery that occurred during the same time and at the same place as the murder. Armed robbery suffices as a predicate felony for felony murder. MCL 750.316(1)(b). For these reasons, the circuit court did not abuse its discretion in reinstating the charges of armed robbery, felony murder, and felony firearm.

In his Standard 4 Brief, Robinson additionally argues that the circuit court's grant of the motion to amend was an abuse of discretion because it only relied on Copeland's testimony. This claim is belied by recitation of the record above which illustrates the circuit court had numerous other pieces of evidence upon which to rely. Still, Robinson complains that any reliance on Copeland's testimony was erroneous where his testimony was later found unreliable and excluded by the circuit court at trial. Robinson is correct that Copeland's testimony was later excluded however, it was not error for the circuit court to consider Copeland's testimony for purposes of reviewing the bind over decision, but later exclude the testimony at trial. "The threshold for the evidence necessary to bind over a defendant for trial is much lower than the evidence needed to convict a defendant of the crime at trial." *People v Greene*, 255 Mich App 426, 443-444; 661 NW2d 616 (2003). "Probable cause requires a quantum of evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." *People v Yost*, 468 Mich 122, 126; 659 NW2d 604 (2003). (citation marks and citation omitted). "To establish that a crime has been committed [at the preliminary examination], a prosecutor need not prove each element beyond a reasonable doubt, but must present some evidence of each element." *Henderson*, 282 Mich App at 312. Robinson's additional Standard 4 argument is equally without merit. He argues that the case should be remanded for an additional preliminary examination on the reinstated charges. This is a restatement of the rejected argument in his attorney brief that the defendants were both unfairly surprised and deprived of adequate notice or a sufficient opportunity to defend against the reinstated charges.

## III. CELL PHONE TOWER TESTIMONY

## A. STANDARD OF REVIEW

"A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion." *People v Burns*, 494 Mich 104, 110; 832 NW2d 738 (2013). We also review a trial court's pretrial decision on a motion in limine for an abuse of discretion. *People v VanSickle*, 303 Mich App 111, 117; 842 NW2d 289 (2013). "An abuse of discretion occurs when [the] trial court's decision is outside the range of principled outcomes." *People v Duenaz*, 306 Mich App 85, 90; 854 NW2d 531 (2014). "Questions whether a defendant was denied a fair trial, or deprived of his liberty without due process of law, are reviewed de novo." *People v Steele*, 283 Mich App 472, 478; 769 NW2d 256 (2009). We review unpreserved evidentiary error for plain error affecting the defendant's substantial rights. *People v Coy*, 258 Mich App 1, 12; 669 NW2d 831 (2003). Substantial rights are affected when the error was outcome determinative and prejudiced the defendant. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

## B. ANALYSIS

The admissibility of expert testimony is governed by MRE 702 and provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"A court considering whether to admit expert testimony under MRE 702 acts as a gatekeeper and has a fundamental duty to ensure that the proffered expert testimony is both relevant and reliable." *People v Kowalski*, 492 Mich 106, 120; 821 NW2d 14 (2012). The court "must ensure that the [expert] testimony (1) will assist the trier of fact to understand a fact in issue, (2) is provided by an expert qualified in the relevant field of knowledge, and (3) is based on reliable data, principles, and methodologies that are applied reliably to the facts of the case." *Id*. As to the first inquiry, "[t]he party proffering the expert's testimony must persuade the court that the expert possesses specialized knowledge which will aid the trier of fact in understanding the evidence or determining a fact in issue." *People v Smith*, 425 Mich 98, 112; 387 NW2d 814 (1986), citing MRE 702. This must be something beyond common knowledge. *Kowalski*, 492 Mich at 123. In other words, the testimony must concern a matter not commonly understood by the average person. *Id*. As to the second inquiry, an expert may be qualified by "knowledge, skill, experience, training, or education." MRE 702. The final inquiry involves reliability. "MRE 702 requires the trial court to ensure that each aspect of an expert witness's proffered testimony-including the data underlying the expert's theories and the methodology by which the expert draws conclusions from that data-is reliable." *Gilbert v Daimler Chrysler Corp*, 470 Mich 749, 779; 685 NW2d 391 (2004). This inquiry is a flexible one and a trial court must ask "whether the opinion is rationally derived from a sound foundation." *Elher v Misra*, 308 Mich App 276, 289–290; 870 NW2d 335 (2014) (internal quotation marks and citation omitted). "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v Merrell Dow*

*Pharm, Inc*, 509 US 579, 592-593; 113 S Ct 2786; 125 L Ed 2d 469 (1993). The court considers: (1) whether the scientific knowledge or technique can, and has been, tested, (2) "whether the theory or technique has been subjected to peer review and publication," (3) "the known or potential rate of error," (4) "the existence and maintenance of standards controlling the technique's operation," and (5) whether there is "general acceptance" of the scientific technique. *Id*. at 593-594. "[T]he trial court's role as gatekeeper does not require it to search for absolute truth, to admit only uncontested evidence, or to resolve genuine scientific disputes." *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008) (citation omitted). Rather, "[t]he inquiry is not into whether an expert's opinion is necessarily correct or universally accepted," it "is into whether the opinion is rationally derived from a sound foundation." *Id*. (citation omitted).

In her attorney brief, Fuwlylie challenges Roy's expert testimony regarding cell phone tower analysis as unreliable to determine her location at or near the time of the homicide. The bases for her assertion are that: 1) multiple factors affected which cell tower a cell phone would use or "ping" to, 2) some treatises and the FCC have questioned cell phone tower analysis as junk science and inaccurate, and 3) the shaded areas and intersecting arcs on the graphic produced by Roy were inaccurate representations of the actual cell phone tower ranges. The first and third bases were acknowledged by Roy as limitations on the evidence and effected the weight of the evidence, not its admissibility. Roy agreed that a cellular phone usually connected with the tower having the strongest signal and admitted that multiple factors could affect a cellular phone's connection with a tower. He also agreed that the boundary of the arcs in the graphic were not static and the shaded areas did not represent the exact location of the cell phones. As to the second basis, the opinion of the FCC and legal research performed on the topic are acknowledged however, no court in Michigan has yet to declare cell phone tracking evidence "junk science" or rejected the testimony of an expert witness on that basis. Further, the contested reliability of cell phone tower analysis would only declare a genuine scientific dispute that the trial court is not required to resolve. *Id*.

Roy's testimony was otherwise admissible under MRE 702 and the trial court did not abuse its discretion in denying Fulwylie's motion in limine and allowing him to testify as an expert at trial. The substance of Roy's testimony was not common knowledge to the average person. The average person would not know how cellphones interacted with cell towers and cellphone networks, how to evaluate cellphone records provided by cellular companies, and how to trace IP addresses. The officer's testimony was admissible to aid the trier of fact to understand the cell phone evidence submitted and argued at trial, and to determine a fact at issue at trial: the identity of Samuel's murderers. Further, Roy was qualified to testify concerning cell phone towers by nature of his knowledge, experience, training, and education on the subject. Roy had over nine years of experience as a Criminal Intelligence Officer analyzing cell phone data. He received specialized training and certification from the Federal Bureau of Investigation in digital evidence collection and preservation, cell phone investigations, cellphone technology, and forensic data recovery, and had performed over 100 exams on mobile devices and 75 cellphone records. In addition, Roy's testimony was based on reliable data, principles, and methodologies that were applied reliably to the facts of the case. The foundation of Roy's testimony was certified business records for the defendants' and Samuel's cell phones obtained directly from the companies Facebook, Pinger, and T Mobile. In analyzing this information, Roy employed a methodology commonly used by law enforcement and taught to him by the FBI. He testified that his cell phone record analysis was recently reviewed by the FBI which concurred with his findings. Thus, Roy

provided reliable testimony that assisted the jurors in understanding how Fulwylie's cell phone records placed her phone in the area of the shooting.

In her Standard 4 Brief, Fulwylie challenges Roy's explanation of why the timestamps on the Hubble surveillance photos were one hour off of the real time as unreliable. Samuel's free Hubble subscription only allowed for the taking of still photos by the Hubble satellite, but not recording and storing of video. The cameras were activated by motion and automatically took camera shots when movement was detected in the house. The Hubble software timestamped these still photos. It was discovered midtrial that the timestamp was actually an hour ahead. In other words, the timestamps created by Hubble showed Fulwylie in Samuel's house at 8:00 p.m., instead of 9:00 p.m., near the time of the murder. Fulwylie argues that Roy was allowed to explain away the difference in times with testimony that was deplete of a factual or scientific basis by simply blaming the difference on Daylight Savings. Fulwylie's assertion ignores the other half of Roy's testimony on this issue. Roy also testified that he verified the Hubble timestamps were off by one hour by comparing the known times of the officers' search of Samuel's home with the still photos taken by Hubble while they were there and learned they were also off by one hour. Regardless, the fact that the Hubble's timestamp was different than the actual time did not prejudice Fulwylie where the difference may have created reasonable doubt as to when she was in the home and could be argued to her advantage.

Fulwylie additionally argues that Roy had no reliable methodology to explain how he learned of her from her Brit Brat Facebook profile, that there was no cell phone activity between herself and codefendant Robinson between 8:13 p.m. and 9:58 p.m., and that Roy was not qualified to give testimony on either forensic data recovery or digital data evidence. Our review of the record including a review of the scope of Roy's testimony, the methodology upon which the testimony was based and, his underlying training and experience leads us to find that the trial court did not err in allowing him to testify as he did in this case.

## IV. 911 CALL

### A. STANDARD OF REVIEW

A trial court's pretrial ruling on a motion in limine and its decision whether to admit evidence are reviewed for an abuse of discretion. *People v VanSickle*, 303 Mich App 111, 117; 842 NW2d 289 (2013). A trial court abuses its discretion when its decision is outside the range of reasonable and principled outcomes. *People v Mahone*, 294 Mich App 208, 212; 816 NW2d 436 (2011). We review questions of law related to a motion in limine de novo. *People v Langlois*, 325 Mich App 236, 240; 924 NW2d 904 (2018).

### B. ANALYSIS

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." US Const, Am VI; see also MCL 763.1 (a criminal defendant has the right to "meet the witnesses who are produced against him face to face."). In *Crawford v Washington*, 541 US 36, 42; 124 S Ct 1354; 158 L Ed 2d 177 (2004), the United States Supreme Court "held that the introduction of out-of-court testimonial statements violates the Confrontation Clause; thus, out-of-court

testimonial statements are inadmissible unless the declarant appears at trial or the defendant has had a previous opportunity to cross-examine the declarant." *People v Nunley*, 491 Mich 686, 698; 821 NW2d 642 (2012). In *Davis v Washington*, 547 US 813, 826; 126 S Ct 2266; 165 L Ed 2d 224 (2006), the United States Supreme Court explained the distinction between nontestimonial and testimonial statements:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution. *Id* at 822.

The Court explained that classic testimonial hearsay involved

> interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator. The product of such interrogation, whether reduced to a writing signed by the declarant or embedded in the memory (and perhaps notes) of the interrogating officer, is testimonial. [*Id*. at 826].

*Davis* was decided together with *Hammon v Indiana*, 547 US 813. Both cases involved domestic disputes where the victim failed to show for trial and the prosecutor attempted to introduce the victim's statements to law enforcement. In *Davis*, the statements were to a 911 operator and in *Hammon* the statements were to law enforcement who responded to the scene. In *Davis*, the Court held that the victim's statements in response to a 911 operator's interrogation were not testimonial, and therefore, were not subject to the Confrontation Clause. The Court rationalized that a 911 call was different from the traditional police station interrogation in that the call to 911 "is ordinarily not designed primarily to establis[h] or prov[e] some past fact, but to describe current circumstances requiring police assistance." *Id*. at 827. The facts relied upon by the Court in finding that the victim's statements in *Davis* were not testimonial were: 1) the victim "was speaking of events as they were actually happening," 2) "was facing an ongoing emergency," 3) elicited to enable the police "to resolve the present emergency, rather than simply to learn (as in *Crawford*) what had happened in the past," and 4) given in an environment that was not safe. *Id*.

In *Hammon*, the Court held that a domestic battery victim's written statements in an affidavit given to a police officer were testimonial, and therefore, subject to Confrontation Clause. *Id*. at 30. The facts relied upon by the Court to reach this conclusion were: 1) "[t]here was no emergency in progress," 2) the "purpose of the interrogation was to investigate a possible crime", and 3) the interrogation took place after the events were over. *Id*.

The facts in this case are more like those in *Davis* than those in *Hammon*. Samuel's statements to the 911 operator were contemporaneous to the evolving emergency threat to his life and were made to garner police assistance to protect him from the planned robbery. Therefore,

the trial court did not abuse its discretion in determining that Samuel's statements were nontestimonial and admissible at trial.

## V.  HABITS OF THE DECEASED

### A.  STANDARD OF REVIEW

"A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion." *Burns*, 494 Mich at 110.  "An abuse of discretion occurs when trial court's decision is outside the range of principled outcomes." *Duenaz*, 306 Mich App at 90.  "Questions whether a defendant was denied a fair trial, or deprived of his liberty without due process of law, are reviewed de novo." *Steele*, 283 Mich App at 478.

### B.  ANALYSIS

MRE 406 provides that,

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

"Such evidence must establish a set pattern or show that something is done routinely or has been performed on countless occasions." *Laszko v Cooper Laboratories, Inc*, 114 Mich App 253, 256; 318 NW2d 639 (1982).  "There is general agreement that habit evidence is highly persuasive as proof of conduct on a particular occasion." *McKinstry v Valley Obstetrics–Gynecology Clinic, PC,* 428 Mich 167, 182 n 6; 405 NW2d 88 (1987).

At issue were eight pieces of evidence, 1) text messages between Samuel and Christine Taylor, 2) testimony from Samuel's ex-girlfriend Egypt Price, 3) testimony from his ex-wife Gabriel Samuel, 4) testimony from Samuel's friend Destiny Jackson, 5) the Black Family Logo on Samuel's Hummer vehicle, 6) Samuel's jewelry, 7) Samuel's tattoos, and 8) money on Samuel's person.  The court permitted Fulwylie to discuss evidence on each of these matters in opening statements.  The court overruled the prosecutor's objection and admitted autopsy photos that showed Samuel's tattoos.  Evidence regarding both Samuel's jewelry and habit of carrying significant sums of cash on his person was also admitted.  Spitz testified that he collected $686.27 in cash from Samuel as well as a watch, necklaces, and various pendants.  Samuel's mother, Donna, testified that Samuel had just purchased a Rolex watch and wore jewelry for show.  Jackson was permitted to testify that Samuel dressed well, wore expensive jewelry, "had a whole bunch of tattoos," drove a big Hummer, posted pictures of himself with "BMF" insignia on the internet, and had "won a lot of money from the casino."  Fuwylie herself chose not to present testimony from Christine, Egypt or Gabriel.  In closing, Fulwylie was allowed to argue over the prosecutor's objection, "what does Mr. Samuel want us to think of him?"  Fulwylie followed with argument that Samuel was "a renegade type," had a Thug Life tattoo, considered himself a member of the Black Mafia Family, and Samuel was known as "Big Pen."  If there was error here, it was in allowing all of this testimony that put the victim on trial.  In any case, the evidence that Fulwylie asserts was improperly excluded was, in substantial part, admitted.

## VI.  SUFFICIENCY OF THE EVIDENCE

### A.  STANDARD OF REVIEW

We review de novo a challenge to the sufficiency of the evidence.  *People v Ericksen*, 288 Mich App 192, 195; 793 NW2d 120 (2010).  "Taking the evidence in the light most favorable to the prosecution, the question on appeal is whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt."  *People v Hardiman*, 466 Mich 417, 421; 646 NW2d 158 (2002).  We resolve conflicts in the evidence in the prosecution's favor.  *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008).  "Circumstantial evidence and reasonable inferences arising from the evidence can constitute satisfactory proof of the elements of the crime."  *People v Harverson*, 291 Mich App 171, 175; 804 NW2d 757 (2010) (citation and alteration omitted).  "It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences."  *Hardiman*, 466 Mich at 428.

### B.  ANALYSIS

Due process requires that evidence of every element of a crime be proved beyond a reasonable doubt in order to sustain a criminal conviction.  *People v Hampton*, 407 Mich 354, 366; 285 NW2d 284 (1979), citing *In re Winship*, 397 US 358, 364; 90 S Ct 1068; 25 L Ed 2d 368 (1970).

To prove first-degree murder the prosecution must show that "the defendant intentionally killed the victim and that the act of killing was premeditated and deliberate."  *People v Mette*, 243 Mich App 318, 330; 621 NW2d 713 (2000); see, also, MCL 750.316(1)(a).  "[B]ecause it can be difficult to prove a defendant's state of mind on issues such as knowledge and intent, minimal circumstantial evidence will suffice to establish the defendant's state of mind . . .."  *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008).  Such "evidence can include a motive to kill, along with flight and lying, which may reflect a consciousness of guilt."  *People v Henderson*, 306 Mich App 1, 11; 854 NW2d 234 (2014).  "Premeditation and deliberation require sufficient time to allow the defendant to take a second look."  *People v Marsack*, 231 Mich App 364, 370-371; 586 NW2d 234 (1998).  In the case of a shooting death, the number of shots fired may be considered in determining whether the defendant acted with premeditation.  *People v Johnson*, 74 Mich App 234, 235-236; 253 NW2d 721 (1977).  Other factors to be considered include: "(1) the previous relationship between the defendant and the victim; (2) the defendant's actions before and after the crime; and (3) the circumstances of the killing itself, including the weapon used and the location of the wounds inflicted."  *People v Plummer*, 229 Mich App 293, 300-301; 581 NW2d 753 (1998).

To prove first-degree felony murder, the prosecution must show:

(1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result [i.e., malice], (3) while committing, attempting to commit, or assisting in the commission of any of the felonies

-10-

specifically enumerated in [MCL 750.316(1)(b), here armed robbery]. [*Carines*, 460 Mich at 758–759 (citation omitted)].

"A jury may infer malice from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm. Malice may also be inferred from the use of a deadly weapon." *Carines*, 460 Mich at 759.

"The elements of armed robbery are: (1) an assault and (2) a felonious taking of property from the victim's presence or person (3) while the defendant is armed with a weapon." *People v Smith*, 478 Mich. 292, 318; 733 NW2d 351 (2007). An "attempted armed robbery with an incomplete larceny is . . . sufficient to sustain a conviction under the . . . armed robbery statute[.]" *Williams*, 491 Mich at 172.

"The elements of felony-firearm are that the defendant possessed a firearm during the commission of, or the attempt to commit, a felony." *People v Avant*, 235 Mich App 499, 505; 597 NW2d 864 (1999).

Fulwylie was convicted under an aiding and abetting theory. One who aids and abets may be charged and convicted as a principal. *People v Smith*, 271 Mich 553, 561; 260 NW 911, 914 (1935); *People v Robinson*, 475 Mich 1, 9; 715 NW2d 44 (2006). To show that an individual aided and abetted the commission of a crime, the prosecution must establish

> (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement." [*Carines*, 460 Mich at 757 (citation omitted).]

With respect to the intent element, our Supreme Court in *People v Robinson*, 475 Mich 1, 15, 715 NW2d 44 (2006), elaborated:

> We hold that a defendant must possess the criminal intent to aid, abet, procure, or counsel the commission of an offense. A defendant is criminally liable for the offenses the defendant specifically intends to aid or abet, or has knowledge of, as well as [for] those crimes that are the natural and probable consequences of the offense he intends to aid or abet. Therefore, the prosecutor must prove beyond a reasonable doubt that the defendant aided or abetted the commission of an offense and that the defendant intended to aid the charged offense, knew the principal intended to commit the charged offense, or, alternatively, that the charged offense was a natural and probable consequence of the commission of the intended offense.

Robinson's argument on sufficiency of the evidence is based upon a misapprehension as to the law in this state. Robinson argues that there was no direct evidence of his involvement in Samuel's murder and that circumstantial evidence alone is insufficient to support a finding of guilt unless it is "consistent only with the theory of guilt and irreconcilable with any reasonable theory of innocence. If such evidence is consistent with a theory of innocence as with a theory of guilt, the doubt must be resolved in favor of the theory of innocence." A similar argument was raised by the defendant in *Eriksen* and rejected as a misstatement of the law in Michigan. *People v*

-11-

*Eriksen*, 288 Mich App 192, 196; 793 NW2d 120 (2010). Robinson has also cited in support of his argument case law from a reversed sufficiency of the evidence determination in Eastern District of Michigan case, *Matthews v Abramajtys*, 92 F Supp 2d 615, 634 (ED Mich, 2000), aff'd in part, rev'd in part 319 F3d 780 (CA 6, 2003). As previously stated, "[c]ircumstantial evidence and reasonable inferences arising from the evidence can constitute satisfactory proof of the elements of the crime." *Harverson*, 291 Mich App at 175 (citation and alteration omitted). While the prosecution's case here was entirely circumstantial, the evidence on the issue of whether the defendant was the perpetrator of the crimes was sufficient to support the jury's convictions against him.

Robinson was linked to this homicide by his relationship with codefendant Fulwylie. Although Samuel told the 911 operator that Fulwylie was "about to be [his] girlfriend," the evidence at trial showed that Fulwylie was still in a long-term relationship with Robinson. The testimony of Kadesha King and the eviction notice discovered by Officer Holly Nunn (Nunn) showed defendants were living together. A gun confiscated at one of the residences Robinson frequented was registered to Fulwylie. Call records and still photos from Samuel's surveillance system established that Fulwylie was talking to Robinson while she was in Samuel's home. Samuel's 911 call revealed that the substance of Fulwylie's calls to Robinson was for Robinson to meet Samuel when he returned from the store and to walk him in at gunpoint. Call records placed Robinson's phone within close proximity to Samuel's home when he received those calls. When Samuel did return home, he was fatally shot three times, once in the back of the head. Shaw witnessed a male matching Robinson's physique run past him into a running vehicle that Shaw and Kobel thought was driven by a female. Although Fulwylie was waiting at Samuel's house for him to return from the store, her whereabouts when Samuel was shot are unknown. When Fulwylie did resurface, she was with Robinson. The jury was able to conclude from this evidence that Robinson was involved in Samuel's murder with Fulwylie.

Viewing the evidence in a light most favorable to the prosecution, there was sufficient evidence to support the jury's convictions for first-degree premeditated murder against both defendants. Samuel's cause of death was multiple gunshot wounds. The jury could deduce from this evidence that Robinson had a firearm. The use of a deadly weapon with multiple gun shots is sufficient to establish an intent to kill. The lapse of time between Fulwylie's summoning Robinson to Samuel's home and his arrival at that home with a weapon provides a basis for premeditation and deliberation by Robinson. The evidence supporting Fulwylie's aider and abettor conviction includes her summoning Robinson, lying in wait for Samuel, and assisting Robinson in fleeing from the crime scene.

Similar evidence supported that Robinson committed an armed robbery and Fulwylie aided and abetted in that crime. Samuel was assaulted with a dangerous weapon that caused his death. From the evidence presented, the jury could conclude that Robinson and Fulwylie intended and planned to rob Samuel at gunpoint when he returned from the store, that Robinson arrived at Samuel's residence armed, and that both defendants fled the scene after the murder, but before any property could be stolen. An "attempted armed robbery with an incomplete larceny is . . . sufficient to sustain a conviction under the . . . armed robbery statute[.]" *Williams*, 491 Mich at 172. The jury could further conclude that Fulwylie aided and abetted Robinson in this crime by notifying Robinson when Samuel was out of the home, of the precise moment to appear, i.e. when Samuel returned, and to come to the home armed. The evidence also illustrated that Fulwylie

instructed Robinson on how to conduct the armed robbery, by walking Samuel at gunpoint into the home where the robbery would be completed.  Lastly, the jury could believe that it was Fulwylie who provided the defendants' means of escape by waiting in a running vehicle at the end of the street for defendant Robinson.

There was also sufficient evidence for the jury to find the defendants guilty beyond a reasonable doubt of felony-murder.  First, a human being was killed, Marcus Samuel.  As noted above Samuel was killed in the process of an attempted robbery.  The jury could infer Robinson's intent to kill or cause great bodily harm from the use of a deadly weapon and Fulwylie's aiding and abetting by her conduct in summoning Robinson whom she had reason to know was armed and lying in wait for Samuel.

Robinson's use and possession of a firearm during the commission of the crimes while also being a felon supported the jury's convictions of felon in possession and felony firearm.

## VII.  PROSECUTORIAL MISCONDUCT

### A.  ISSUE PRESERVATION AND STANDARD OF REVIEW

"In order to preserve an issue of prosecutorial misconduct, a defendant must contemporaneously object and request a curative instruction."  *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010).  Defendant Fulwylie argues two instances of unpreserved prosecutorial misconduct.  In the first instance, Fulwylie did not object to the admission of evidence concerning her finances during the testimony of her mother Alisha Kiovanni.  In the second instance, Fulwylie objected to the admission of an eviction notice during Nunn's testimony, but not on grounds of prosecutorial misconduct.  At trial, Fulwylie joined in Robinson's objection to the admission of the eviction notice based on hearsay grounds.  Defendant Robinson's sole argument of prosecutorial misconduct was not objected to below.

"This Court reviews claims of prosecutorial misconduct case by case, examining the remarks in context, to determine whether the defendant received a fair and impartial trial."  *People v Aldrich*, 246 Mich App 101, 110; 631 NW2d 67 (2001).  "Where a defendant fails to object to an alleged prosecutorial impropriety, the issue is reviewed for plain error."  *Id*.  This Court "cannot find error requiring reversal where a curative instruction could have alleviated any prejudicial effect."  *People v Callon*, 256 Mich App 312, 329-330; 662 NW2d 501 (2003).

### B.  ANALYSIS

"Prosecutors are typically afforded great latitude regarding their arguments and conduct at trial. They are generally free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case."  *People v Unger*, 278 Mich App 210, 236; 749 NW2d 272 (2008) (citation omitted).  However, "[a] defendant's opportunity for a fair trial can be jeopardized when the prosecutor interjects issues broader than the defendant's guilt or innocence."  *People v Dobek*, 274 Mich App 58, 63–64; 732 NW2d 546 (2007).  "Evidence of a defendant's financial condition, because it ordinarily has limited probative value and usually goes to a collateral issue, will often distract rather than aid the jury."  *People v Henderson*, 408 Mich 56, 65; 289 NW2d 376 (1980).  Its prejudicial impact is high and carries the risk that jurors will "view a defendant as a 'bad man' a poor provider, a worthless individual."  *Id*. at 66.  Still, there is no per se rule that

-13-

evidence of one's financial condition is never admissible. *Id.* "[T]he prosecutor's comments must be considered in light of defense counsel's comments." *People v Watson*, 245 Mich App 572, 592-593; 629 NW2d 411 (2001). "[A]n otherwise improper remark may not rise to an error requiring reversal when the prosecutor is responding to the defense counsel's argument." *People v Kennebrew*, 220 Mich App 601, 608; 560 NW2d 354 (1996).

Defendant Fulwylie alleges two instances of prosecutorial misconduct. Both relate to Fulwylie's finances. The more substantive assertion of prosecutorial misconduct occurred when Nunn testified that she found an eviction notice in the Sebring vehicle that she processed as part of the murder investigation. Fulwylie's complaint on appeal is that the jury learned the eviction notice was addressed to both Fulwylie and Robinson and that it stated no rent had been paid since October with an amount of $2250 past due. Fulwylie argues that the implication to be drawn was that she was a "bad woman" and financially desperate enough to rob someone and participate in a murder. Having reviewed Nunn's testimony in its entirety, we conclude that the officer's testimony on direct examination concerning the eviction notice being against Fulwylie and Robinson was not evidence of prosecutorial misconduct. The testimony was not meant to financially embarrass Fulwylie, but was directly related to the prosecutor's theory of the case that Fulwylie was still in a relationship with Robinson. The prosecutor was permitted to argue the evidence and all reasonable inferences from the evidence as it related to his theory of the case. *Unger*, 278 Mich App at 236. The fact that both defendants' names were on the eviction notice showed no more than that they were living together, which was the prosecutor's exact purpose in eliciting the information. Reviewing the prosecutor's conduct on redirect examination in context, the testimony elicited from Nunn concerning the basis for the eviction notice was invited and appropriately responsive to Fulwylie's cross-examination. *People v Jones*, 468 Mich 345, 353; 662 NW2d 376 (2003).

Fulwylie also argues that the prosecutor improperly elicited testimony from her mother, Kiovanni, that she and Robinson were experiencing financial troubles and that she had to move back into Kiovanni's home. Reviewing the colloquy in context, it is clear that Kiovanni denied knowing why Fulwylie moved back in with her and whether Fulwylie was in any financial trouble. Consequently, no improper testimony was elicited from Kiovanni. Even if the prosecutor's questions presumed financial stress, the jury was instructed that questions by counsel were not evidence.

In his Standard 4 Brief, Robinson argues that the prosecutor misrepresented facts to the jury by arguing that Robinson sometimes drove a white vehicle and that a white vehicle left the crime scene. An attorney may not argue facts not in evidence. *People v Stanaway*, 446 Mich 643, 686; 521 NW2d 557 (1994). However, an attorney may argue the evidence and all inferences therefrom. *Unger*, 278 Mich App at 236. In this case, the vehicle that sped away from the murder scene was never recovered. Detective Curt Priemer investigated the vehicles for both defendants. He testified that Fulwylie drove a blue Chrysler Sebring and Robinson drove a silver Dodge Charger and a white Ford Fusion. There was no objection to this testimony. Kobel described the vehicle she saw leaving the scene as a "sleek" "silver" "four door sedan" that "[h]ad grooves that ran underneath the windows, from the front to the back hood of the car." Kobel testified that the vehicle looked a lot like the newer model of her Chevy Cruz. During closing arguments, the prosecutor showed the jury a picture of the 2018 model of the Ford Fusion. It was silver and had grooves along the side. The prosecutor then argued that there were similarities between a Chevy

-14-

Cruz and the newer model of the Ford Fusion.[1] The prosecutor did not argue that the Ford Fusion was witnessed leaving the scene. The testimony at trial supported the prosecutor's argument and the conclusion to be drawn that the Ford Fusion matched Kobel's description of the vehicle she witnessed speed away from the scene of Samuel's murder. There can be no prejudicial effect from comments that did not amount to misconduct, and defendant otherwise received a fair trial. Further, the prosecutor's comment was said during closing arguments. The jury was instructed that the arguments of counsel were not evidence and jurors are presumed to follow the instructions of the court. *People v Meissner*, 294 Mich App 438, 457; 812 NW2d 37 (2011). Additionally, defendant Robinson's failure to object deprived him of a curative instruction. "Curative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements, [and] we cannot find error requiring reversal where a curative instruction could have alleviated any prejudicial effect." *Unger*, 278 Mich App at 235 (citations omitted).

## VIII. JURY INSTRUCTIONS

### A. STANDARD OF REVIEW

"We review a claim of instructional error involving a question of law de novo, but we review the trial court's determination that a jury instruction applies to the facts of the case for an abuse of discretion." *People v Dupree*, 486 Mich 693, 702; 788 NW2d 399 (2010). "A trial court may be said to have abused its discretion only when its decision falls outside the principled range of outcomes." *People v Blackston*, 481 Mich 451, 460; 751 NW2d 408 (2008).

### B. ANALYSIS

"A criminal defendant is entitled to have a properly instructed jury consider the evidence against him." *People v Riddle*, 467 Mich 116, 124; 649 NW2d 30 (2002). "A court must instruct the jury so that it may correctly and intelligently decide the case." *People v Crawford*, 232 Mich App 608, 619; 591 NW2d 669 (1998). "Jury instructions must therefore include all the elements of the charged offenses and any material issues, defenses, and theories that are supported by the evidence." *People v Fennell*, 260 Mich App 261, 265; 677 NW2d 66 (2004) (footnote omitted).

This Court reviews jury instructions in their entirety to determine if there is error requiring reversal. *People v McFall*, 224 Mich App 403, 412; 569 NW2d 828 (1997). "The defendant's conviction will not be reversed unless, after examining the nature of the error in light of the weight and strength of the untainted evidence, it affirmatively appears that it is more probable than not that the error was outcome determinative." *Riddle*, 467 Mich at 124-125. "Even if the instructions are imperfect, there is no error if they fairly presented the issues to be tried and sufficiently protected the defendant's rights." *People v Daniel*, 207 Mich App 47, 53; 523 NW2d 830 (1994).

It is well established in Michigan law that evidence of flight is admissible. Such evidence is probative because it may indicate consciousness of guilt, although evidence of flight by itself is insufficient to sustain a conviction. The term "flight"

---

[1] The silver Dodge Charger was excluded as having been involved in the murder and the Ford Fusion was returned to the dealer by Robinson's grandmother and could not be located.

has been applied to such actions as fleeing the scene of the crime, leaving the jurisdiction, running from the police, resisting arrest, and attempting to escape custody. [*People v Coleman*, 210 Mich App 1, 4; 532 NW2d 885 (1995) (citations omitted)].

At trial, defendant Robinson argued that the model jury instruction for flight presupposed that the identity of the perpetrators was established, by telling the jury that there was some evidence that *these defendants* ran away after the alleged crime. Robinson requested the court modify the instruction to read, "there has been some evidence that the perpetrators, or the alleged perpetrators, ran away after the alleged crime." The court declined Robinson's request and held, "there is some evidence that these defendant [sic], if the jury believes it was them, ran from the scene."

The jury was instructed that,

There has been some evidence that the defendants ran away after the alleged crime. This evidence does not prove guilt. A person may run or hide for innocent reasons, such is panic, mistake, or fear. However, a person may also run or hide because of a consciousness of guilt. You must decide whether the evidence is true and if true whether it shows that the defendants had a guilty state of mind.

The trial court did not abuse its discretion in determining that there was evidence to support instructing the jury on flight. Robinson is correct that there was no direct evidence identifying him as the shooter however, a substantial amount of circumstantial evidence existed to support that Robinson fled the scene of Samuel's shooting. Samuel's 911 call, still photos from his surveillance system, and Fulwylie's cellular phone records were evidence that Fulwylie called Robinson to the scene of the crime. Samuel's neighbors placed someone matching Robinson's description running away from Samuel's body and toward a vehicle which sped away. Testimony from Fulwylie's mother established that Fulwylie and Robinson were together shortly after the shooting occurred. The court did not err in giving M Crim JI 4.4 as modified.

IX. DOUBLE JEOPARDY

A. ISSUE PRESERVATION AND STANDARD OF REVIEW

"To preserve appellate review of a double jeopardy violation, a defendant must object at the trial court level." *People v Ackah-Essien*, 311 Mich App 13, 30; 874 NW2d 172 (2015). Neither defendant preserved this issue by objecting at trial.

"A double jeopardy challenge presents a question of law that we review de novo." *People v Herron*, 464 Mich 593, 599; 628 NW2d 528 (2001). We review an unpreserved claim of double jeopardy for plain error that affected the defendant's substantial rights. *People v McGee*, 280 Mich App 680, 682; 761 NW2d 743 (2008).

B. ANALYSIS

"The Double Jeopardy Clause of the Fifth Amendment protects against two general governmental abuses: (1) multiple prosecutions for the same offense after an acquittal or

conviction; and (2) multiple punishments for the same offense." *Herron*, 464 Mich at 599. "In *People v. Bigelow*, 229 Mich. App. 218, 581 N.W.2d 744 (1998), this Court concluded that separate convictions and sentences for both premeditated murder and felony murder, both of which arose from a single instance of criminal conduct, violated the rule against double jeopardy. *Id.* at 220, 581 N.W.2d 744." *People v Mackle*, 241 Mich App 583, 601; 617 NW2d 339 (2000). "[T]o avoid double-jeopardy implications, the defendant receives one conviction of first-degree murder, supported by two theories, and the conviction of the predicate felony underlying the felony murder is vacated." *People v Williams*, 475 Mich 101, 103; 715 NW2d 24 (2006).

Here, defendants were twice convicted for Samuel's murder. Robinson and Fulwylie were convicted and sentenced for both first-degree premeditated murder and first-degree felony-murder arising from one homicide offense. In accord with *Williams*, we vacate the armed robbery conviction for both defendants and remand to the trial court to amend the judgment of sentence to show one murder conviction and impose a sentence that is supported by two theories: premeditated murder and felony murder. *Id*. In Robinson's case, we also vacate the felony firearm conviction attached to the felony murder conviction. "If the substantive crime underlying a felony firearm conviction must be vacated, then that accompanying felony-firearm conviction also must be vacated." *People v Harding*, 443 Mich 693, 717; 506 NW2d 482 (1993), abrogated on other grounds by *People v Ream*, 481 Mich 223; 750 NW2d 536 (2008). Accordingly, Robinson's judgment of sentence must be further amended to show only one conviction for felony firearm.

## X. CONCLUSION

In Docket Nos. 344343, we affirm defendant Fulwylie's conviction and sentence for first-degree murder, supported by the two alternate theories of premeditated murder and felony murder, and vacate defendant's conviction and sentence for armed robbery.

In Docket No. 344445, we affirm defendant Robinson's convictions and sentences for first-degree murder supported by the two alternate theories of premeditated murder and felony murder, one count felony firearm, and felon in possession of a firearm, and vacate defendant's convictions and sentences for armed robbery and one count felony firearm.

In both appeals, we remand for correction of the Judgment of Sentence. We affirm in all other respects. We do not retain jurisdiction.

/s/ Michael J. Riordan
/s/ Kathleen Jansen
/s/ Cynthia Diane Stephens

-17-