*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
September 12, 2024

Plaintiff-Appellee,

v

No. 362939
Wayne Circuit Court
LC No. 20-003225-01-FC

MARC ANTHONY KOZICKI,

Defendant-Appellant.

Before: K. F. KELLY, P.J., and CAVANAGH and M. J. KELLY, JJ.

PER CURIAM.

Defendant appeals as of right from his jury convictions of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(a), (2)(b) (victim under the age of 13 years and the defendant over the age of 17 years), and two counts of second-degree criminal sexual conduct (CSC-II), MCL 750.520c(1)(a), (2)(b) (victim under the age of 13 years and the defendant over the age of 17 years). He was sentenced to concurrent terms of 25 to 50 years and 10 to 15 years. Defendant was also required to register as a sex offender and is subject to lifetime electronic monitoring. We affirm.

JS was 15 years old at the time of trial. Her mother was defendant's girlfriend for many years. JS testified that defendant first sexually assaulted her when she was about five or six years old at defendant's apartment in St. Clair Shores, Michigan. The prosecution offered evidence of the initial assault under MCL 768.27a as other-acts evidence because it occurred outside of Wayne County.

The incidents forming the basis for the offenses occurred later at JS's home in Grosse Pointe Park, Michigan. JS and her immediate family, including defendant, lived with extended family members in that home, including JS's grandfather and her uncle, Anthony.

The incident supporting the charge of CSC-I occurred when JS was about 10 or 11 years old and she described defendant sexually penetrating her when she was in the kitchen late at night. The two counts of CSC-II were brought because JS described defendant grabbing her buttocks multiple times over the years.

-1-

In addition, JS offered testimony about another incident involving defendant for which he was not charged. That incident occurred when JS was about seven years old and she was sleeping on a couch when defendant returned from work. She described waking up and finding that her pants were down as defendant was pulling them up. She noticed "white sticky stuff" in her underwear.

JS later revealed to her grandfather that defendant grabbed her buttocks, which led to defendant being kicked out of the house on Thanksgiving in 2019. Later on in 2020, JS disclosed the sexual acts committed by defendant and her mother and uncle took her to the police station to make a report.

## I. DEFENDANT'S FINANCIAL STATUS

Defendant argues that reversal is required because the prosecutor used defendant's financial dependence on JS's mother to convict him of these offenses. During closing argument, the prosecutor argued that defendant hid his conduct with JS very well from JS's family members, particularly JS's mother, because defendant was living with JS's mother and her family, making JS's mother his "meal ticket."

Defendant failed to object to the portion of the prosecutor's closing argument he challenges on appeal. A defendant must contemporaneously object and request a curative instruction in order to preserve an issue involving prosecutorial misconduct. *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). Accordingly, he has not preserved his argument that the prosecutor erred or committed misconduct. Unpreserved claims of prosecutorial misconduct are reviewed for plain error affecting the defendant's substantial rights. *People v Roscoe*, 303 Mich App 633, 648; 846 NW2d 402 (2014). This Court will not reverse if the alleged prejudicial effect of the prosecutor's conduct could have been cured by a timely instruction. *Bennett*, 290 Mich App at 476 (citation omitted).

Alternatively, defendant argues that his trial counsel was ineffective for not objecting and requesting a curative instruction. Defendant raised this issue in his motion for a new trial, which was denied by the trial court. That argument is preserved. See *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). Whether the defendant has been denied effective assistance of counsel is a mixed question of fact and constitutional law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). This Court reviews any factual findings for clear error and reviews de novo questions of constitutional law. *Id*. Because the trial court did not hold an evidentiary hearing on this issue before ruling on defendant's motion for a new trial, this Court's review is limited to mistakes apparent on the record. *People v Riley (After Remand)*, 468 Mich 135, 139; 659 NW2d 611 (2003).

The test for prosecutorial misconduct is whether the defendant was denied a fair trial. *People v Bahoda*, 448 Mich 261, 266-267; 531 NW2d 659 (1995).

> A prosecutor has committed misconduct if the prosecutor abandoned his or her responsibility to seek justice and, in doing so, denied the defendant a fair and impartial trial. A prosecutor can deny a defendant his or her right to a fair trial by making improper remarks that "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." We must evaluate instances of

prosecutorial misconduct on a case-by-case basis, reviewing the prosecutor's comments in context and in light of the defendant's arguments. [*People v Lane*, 308 Mich App 38, 62-63; 862 NW2d 446 (2014) (footnotes omitted and alteration in original).]

The prosecutor is permitted to argue the evidence and make reasonable inferences to support his theory of the case. *Bahoda*, 448 Mich at 282. However, the prosecutor must refrain from making prejudicial remarks. *Id*. at 283. While a prosecutor has a duty to see to it that a defendant receives a fair trial, he may use "hard language" when the evidence supports it and he is not required to phrase his arguments in the blandest of terms. *People v Ullah*, 216 Mich App 669, 678; 550 NW2d 568 (1996). "A prosecutor may not make a statement of fact to the jury that is unsupported by evidence, but she is free to argue the evidence and any reasonable inferences that may arise from the evidence." *People v Ackerman*, 257 Mich App 434, 450; 669 NW2d 818 (2003).

Defendant correctly argues that evidence of a defendant's financial status must be scrutinized because of its possible prejudicial impact, but there is no per se rule prohibiting the admission of such evidence. See *People v Henderson*, 408 Mich 56, 62-63; 289 NW2d 376 (1980). In *People v Johnson*, 393 Mich 488, 493-497; 227 NW2d 523 (1975), the Court reversed where the defendant was extensively cross-examined on his background, including his unemployment and poverty. The prosecutor also argued to the jury that it could consider that the defendant did not have "two cents in his pocket" and had not worked in a long time when deciding if the defendant committed the offense of carrying a concealed weapon. *Id*. at 496. Our Supreme Court found error with this argument and the prosecutor's cross-examination:

Obviously neither poverty nor unemployment is an element of the crime of carrying a concealed weapon. Either a poor man or a rich man may be either guilty or innocent of carrying a concealed weapon. Likewise whether a man is employed or unemployed is no proof or partial proof of carrying a concealed weapon. Neither does defendant's poverty or unemployment affect his testimonial credibility in this case. In short, these things neither in law nor in logic are evidence of defendant's guilt or innocence or his tendency to lie or tell the truth. To assert otherwise is to argue a *non sequitur*.

Consequently this argument and advice to the jury by the prosecutor is erroneous and patently prejudicial. And in this connection so is the cross-examination leading up to this argument and advice. [*Johnson*, 393 Mich at 496-497 (footnote omitted).]

In *Henderson*, 408 Mich at 65-68, the defendant was charged with embezzlement and the Court allowed the jury to hear about the defendant's more recent financial condition because it was not offered to prove that the defendant was unemployed or impoverished:

We agree with the propositions quoted above from [*State v*] *Mathis* [47 NJ 455, 472; 221 A2d 529 (1966),] and *Davis* [*v United States*, 133 US App DC 167, 171; 409 F2d 453, 457-458 (1969)]. There is a need to avoid undue prejudice in individual cases and to prevent establishment of a "two-tiered standard of justice"

weighing more heavily on the poor. And we recognize that evidence of a defendant's financial condition, because it ordinarily has limited probative value and usually goes to a collateral issue, will often distract rather than aid the jury.

Our decision reversing the Court of Appeals does not, however, allow "routine use" of evidence of financial condition.

*Johnson*[, 393 Mich at 488], and most of the post-*Johnson* Court of Appeals cases involving similar issues, concerned evidence that the defendant was unemployed and poor.

The prosecutor's proofs in the instant case, rather than showing unemployment, established that Henderson was not only employed, but held a managerial position. The evidence that his electricity was shut off for non-payment, viewed in light of this evidence of employment, carried with it no suggestion that Henderson was "poor."

There is a difference between evidence of poverty and unemployment— evidence that a person is chronically short of funds—and evidence of the sort involved in this appeal, showing that a person is experiencing a shortage of funds that appears to be novel or contrary to what one would expect is typically felt by such a person.

Evidence of poverty, dependence on public welfare, unemployment, underemployment, low paying or marginal employment, is not admissible to show motive. The probative value of such evidence is diminished because it applies to too large a segment of the total population. Its prejudicial impact, though, is high. There is a risk that it will cause jurors to view a defendant as a "bad man"—a poor provider, a worthless individual.

Other evidence of financial condition may, however, be admissible in the circumstance of a particular case.

Henderson was not charged with an ordinary theft offense such as larceny, robbery or breaking and entering. He was charged with embezzlement.

As the Court of Appeals observed in the instant case, "(t)he motive for a theft offense seldom requires explanation." Motive in the typical case is a collateral issue of minimal importance.

Embezzlement, however, is not a typical theft offense. The embezzler, by definition, begins from a position of trust, and is usually gainfully employed. In the instant case, the evidence in the prosecution's case-in-chief unavoidably showed that Henderson was employed in a managerial position, that only Henderson and his district supervisor knew the combination to the service station safe, and that Henderson was the only person to have a key to the storeroom.

In these circumstances, the question of motive took on a significance not present in the typical theft case. Jurors may have wondered why Henderson, enjoying both gainful employment and his employer's trust, would breach that trust and risk losing his employment. In short, the motive for *this* theft offense "require(d) explanation."

Federal courts have referred to evidence of poverty to show motive as a "forbidden theme," but have recognized that "the special nature of the crime charged may justify the use of evidence of financial embarrassment in order to show the accused's knowledge and motive, as where one is charged with embezzlement or similar financial misconduct."

What marks embezzlement and similar offenses is that the factual setting in which those crimes occur—a position of trust, gainful employment—generally causes one to wonder about the defendant's motive.

This is not to say that evidence of a defendant's financial condition is admissible whenever embezzlement or a similar crime is charged, regardless of the nature of the evidence or the circumstances in which it is introduced. In this regard, we note that the testimony showing that Henderson's electricity had been shut off was not necessarily probative of an acute and seemingly atypical need for money at the time of the offense; mere financial embarrassment is not such a need. A judge may, in the exercise of discretion, bar evidence of financial embarrassment when persuaded that it is insufficiently probative of need. Henderson did not seek to invoke the judge's discretion in that regard. [Footnotes omitted; emphasis in original.]

The facts of this case do not fall under the holding in *Johnson*, where the prosecutor blatantly used the defendant's poverty to argue that he must have committed the offense because he was poor and unemployed. Nonetheless, this case does not involve a situation as was present in *Henderson*, when the prosecutor showed a likely link between the defendant's alleged actions and his more recent financial condition.

In the case at bar, the jury was made aware that defendant was residing with JS's family possibly because of financial problems, although defendant also had a child with JS's mother. However, defendant's financial condition was not a topic explored in any depth, although the jury likely could have picked up on the fact that defendant may not have been well off.

The prosecutor's argument did not suggest to the jury that defendant was guilty of any of the charges in this case because he was poor, unemployed, or unable to afford his own housing; thus, the comments were not objectionable. The challenged comments were not a blatant attempt to convict defendant because of his financial status. Accordingly, plain error did not occur. However, even if the comments could be considered objectionable, a timely objection and curative instruction would have alleviated any possible prejudice to defendant.

Furthermore, defendant has not shown that his counsel was ineffective. To demonstrate ineffective assistance of counsel, defendant must first establish that counsel's performance was

deficient, which involves "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *People v Leffew*, 508 Mich 625, 637; 975 NW2d 896 (2022), quoting *Strickland v Washington*, 466 US 668, 690; 104 S Ct 2052; 80 L Ed 2d 674 (1984). Defendant must also demonstrate that he was prejudiced by counsel's error. To establish prejudice, defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Leffew*, 508 Mich at 637, quoting *Strickland*, 466 US at 694. "Reasonable probability means 'a probability sufficient to undermine confidence in the outcome.' " *Leffew*, 508 Mich at 637, quoting *Strickland*, 466 US at 694.

To prove that counsel's performance was deficient, defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001). This Court is reluctant to substitute its judgment for that of trial counsel with respect to matters of trial strategy. *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002). Counsel will only be found ineffective on the basis of strategic decisions if the strategy employed was not sound or reasonable. *People v Cline*, 276 Mich App 634, 637; 741 NW2d 563 (2007). The failure to advance a meritless argument or raise a futile objection does not amount to ineffective assistance of counsel. *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

As discussed above, the prosecutor's argument was not objectionable. However, even if it was objectionable, counsel may have decided that it was better not to seek a curative instruction, for strategic reasons, when a special instruction might have simply highlighted the prosecutor's argument for the jury. The jury was otherwise instructed that what the attorneys said was not evidence, which counsel may have felt was sufficient. Regardless, it is difficult to see how defendant was prejudiced by the prosecutor's comment when he did not expressly link defendant's financial status to whether he committed these offenses. For these reasons, the trial court did not err in denying his motion for a new trial due to ineffective assistance of counsel.

## II. OTHER-ACTS EVIDENCE

Defendant argues that it was error for the jury to hear testimony from JS's uncle, Anthony, about other sexual assaults or acts he witnessed defendant commit. In his testimony, Anthony recounted observing defendant grabbing JS's buttocks, looking into JS's bedroom when she was naked, and kissing JS inappropriately. Defendant was required to object to the testimony on the same ground now challenged on appeal to preserve the underlying evidentiary question. See *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019). Because he did not object at trial to Anthony's testimony on the grounds asserted on appeal, this part of his argument is not preserved.

Defendant, however, argues that his trial counsel was ineffective for not objecting. That argument was made by defendant in his motion for a new trial, so that part of this issue is preserved. See *Heft*, 299 Mich App at 80. Defendant also argued in his motion for a new trial that MCL 768.27a is unconstitutional, so that issue is also preserved. See *id*.

While the prosecutor moved before trial to admit other-acts evidence under MCL 768.27a, that motion involved only testimony from JS. There was no request to allow Anthony to offer evidence of other sexual assaults committed by defendant under MCL 768.27a or MCL 768.27b,

or under MRE 404(b). Defendant argues that he did not receive the required notice from the prosecutor that Anthony would offer this evidence, per MCL 768.27b(2). Defendant contends that Anthony's testimony should have been barred by MRE 403, when its probative value was substantially outweighed by the danger of unfair prejudice or confusion of the issues.

First, the only possible act of sexual assault Anthony testified about was observing defendant grabbing JS's buttocks. The prosecution charged defendant with two counts of CSC-II involving defendant grabbing JS's buttocks. Because Anthony testified about one of those possible incidents, his testimony on that point was not about a prior act of sexual assault by defendant, but involved the charged conduct in this case. As explained in *People v Jackson*, 498 Mich 246, 262; 869 NW2d 253 (2015), MRE 404(b) only applies to evidence of other crimes, wrongs, or acts, other than the conduct at issue in the case. The same logic would apply to MCL 768.27b. Accordingly, defendant has failed to show that notice was required under MCL 768.27b(2) when the only portion of Anthony's testimony involving sexual assault was conduct charged in this case.

The other acts Anthony testified about, defendant observing JS naked and kissing her inappropriately, do not appear to qualify as sexual assaults under MCL 768.27b. MCL 768.27b(6)(c) defines a "sexual assault" as a listed offense, as that term is defined in MCL 27.722. Defendant has not explained how either of these latter acts constitute sexual conduct or contact to qualify as an assault. Therefore, MCL 768.27b does not apply to that evidence and defendant has not shown that notice was required by MCL 768.27b(2).

It is possible that the testimony from Anthony about observing defendant looking into the bedroom and kissing JS involved conduct admissible under MRE 404(b)[1], as evidence of other wrongs, even if that conduct may not rise to the level of a crime. The prosecutor offered that evidence to prove defendant's intent, making this evidence admissible under MRE 404(b) for a purpose other than to show defendant's bad character. It is possible for defendant to argue that he should have received written notice under MRE 404(b)(2) at least 14 days before trial or the prosecutor should have demonstrated good cause for not providing notice.

We cannot say that the lack of notice under MRE 404(b)(2) affected defendant's substantial rights when it appears that the trial court would have allowed Anthony's testimony regarding observing defendant kissing JS and watching her in her bedroom. This evidence was properly admitted to prove defendant's intent in his contact with JS. Therefore, even if the lack of notice might be plain error, defendant's substantial rights were not affected. See *People v Hawkins*, 245 Mich App 439, 453-456; 628 NW2d 105 (2001). While defendant also claims his counsel should have argued that this evidence was substantially more prejudicial than probative and barred by MRE 403, it appears that he would not have succeeded on that argument. Defendant has not shown

---

[1] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See 512 Mich lxiii (2023). We rely on the versions of MRE 403 and MRE 404(b) in effect at the time of trial in June 2022.

that his trial counsel's failure to object to this evidence prejudiced defendant when the trial court likely would have admitted this evidence.

Finally, defendant argues that MCL 768.27a violates due process and is unconstitutional. Defendant's constitutional arguments have been rejected by this Court and MCL 768.27a can be used to admit evidence of the defendant's propensity to commit other offenses against minors. See *People v Muniz*, 343 Mich App 437, 459-461; 997 NW2d 325 (2022).

## III. JURY INSTRUCTIONS

Next, defendant argues that his counsel should have requested the jury to be instructed that it was required to reach a unanimous verdict on which acts by defendant formed the basis of the two counts of CSC-II. Defendant argues that a general instruction to the jury—that it was required to return a unanimous verdict—was not sufficient on the facts of this case. We disagree.

In order to preserve an instructional issue, the defendant must object before the jury deliberates, *People v Gonzalez*, 256 Mich App 212, 225; 663 NW2d 499 (2003), disapproved of on other grounds 469 Mich 966, 967 (2003), or request a given instruction, *People v Sabin*, 242 Mich App 656, 657; 620 NW2d 19 (2000), remanded on other grounds 459 Mich 924 (1998). Defendant did not object to the court's proposed instructions or request that the court give a specific instruction on unanimity when the court discussed the instructions. The underlying issue is not preserved. Defendant alternatively argues that his counsel was ineffective for not objecting. Because defendant moved for a new trial on this issue, that part of his argument is preserved. See *Heft*, 299 Mich App at 80.

Because defendant's instructional argument was not preserved, this Court will reverse only if he can show that plain error occurred that affected his substantial rights. See *Thorpe*, 504 Mich at 252. This Court will not reverse unless defendant is actually innocent or the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Id*. at 252-253. Whether defendant has been denied effective assistance of counsel is a mixed question of fact and constitutional law. *LeBlanc*, 465 Mich at 579. This Court reviews any factual findings for clear error and reviews de novo questions of constitutional law. *Id*. Because the trial court did not hold an evidentiary hearing on this issue before ruling on defendant's motion for a new trial, this Court's review is limited to mistakes apparent on the record. See *Riley*, 468 Mich at 139.

As noted above, defendant did not request a special instruction on reaching a unanimous verdict. After the jury began its deliberations, it sent out a note, asking the court to clarify the distinction between the two counts of CSC-II. In response to the jury's question, both sides approved of the court giving the jury the following instruction:

> I've received a note from the jury, and the question from the jury is:
>
> Please clarify the distinction between the two counts second[-]degree C.S.C.
>
> I'm gonna start with reading you the standard in jury—jury instruction, 3.20, that was already read to you, but I'm gonna reread that to you.

The defendant is charged with three counts.

That is, with the crimes of criminal sexual conduct 1st; and two counts of criminal sexual conduct second degree.

These are separate crimes, and the Prosecutor is charging that the defendant committed all of them.

You must consider each crime separately, in light of all the evidence in the case.

You may find the defendant guilty of all, or any one, or any combination of these crimes, or not guilty.

You are to rely on all the jury instructions, and your collective memory of the evidence.

We'll send you back in, have you continue deliberating, all right?

*DEPUTY*: All rise for the jury.

*THE COURT*: And I'm, I'm sorry, before they go, is that [sic] any objection to what I just did?

*MR. MAKEPEACE [the prosecutor]*: No, Your Honor.

*THE COURT*: Any objections, additions, corrections, deletions?

*MR. MAKEPEACE*: No, Judge.

*MR. BERRY [defense counsel]*: No additions, or deletions, or corrections.

In his motion for a new trial, defendant argued that the trial court should have instructed the jury consistent with *People v Cooks*, 446 Mich 503; 521 NW2d 275 (1994), or alternatively, defense counsel was ineffective for not objecting or requesting a special instruction. Defendant argues that his right to a unanimous jury verdict, MCR 6.410(B), was violated because the court did not give specific instructions to the jury regarding returning a unanimous verdict. A court can fulfill its duty to instruct the jury on the unanimity requirement by providing the jury with the general or model instruction on unanimity. *People v Chelmicki*, 305 Mich App 58, 67-68; 850 NW2d 612 (2014); M Crim JI 3.11(3). "However, a specific unanimity instruction may be required in cases in which 'more than one act is presented as evidence of the *actus reus* of a single criminal offense' and each act is established through materially distinguishable evidence that would lead to juror confusion." *Chelmicki*, 305 Mich App at 68, citing *Cooks*, 446 Mich at 512-513.

This case is similar to the facts in *Cooks*, 446 Mich at 527-528, where the Court held that a specific unanimity instruction was not necessary when the evidence offered in support of proving multiple acts of sexual penetration was materially identical. There also was no defense offered to refute some of the evidence, but the defendant denied committing any inappropriate behavior. *Id*.

at 528. Because neither party presented any materially distinct proofs regarding any of the alleged acts, there was no need, on the facts, for a specific unanimity instruction, even though the dates involved were not specified in the information. *Id*. at 528-529. See also *People v Van Dorsten*, 441 Mich 540, 545; 494 NW2d 737 (1993); *People v Bailey*, 310 Mich App 703, 719; 873 NW2d 855 (2015).

While there was some potential juror confusion in this case, as evidenced by the jury's question, a specific instruction on unanimity was not required. Furthermore, even if defense counsel had objected or requested such an instruction, it appears clear that the trial court would not have given it when, as discussed above, the existing authority would not have supported giving the jury further instructions. For this reason, defendant has not shown that his trial counsel was ineffective for failing to object to the court's instructions when any objection would have been futile. See *People v Darden*, 230 Mich App 597, 605; 585 NW2d 27 (1998).

## IV. THE 2021 SORA

As part of his sentence, defendant must register as a sex offender under the Sex Offenders Registration Act (SORA), MCL 28.721 *et seq*. The SORA was amended by 2020 PA 295, effective March 24, 2021 (the 2021 SORA). Because the 2021 SORA was adopted after these crimes occurred, defendant argues that it amounts to ex post facto legislation and he should not be required to register as a sex offender or comply with the 2021 SORA. We disagree.

In order for a defendant to preserve a claim that his punishment violates the ex post facto clauses of the state or federal constitution, the defendant must raise the issue before the trial court. *People v Earl*, 297 Mich App 104, 111; 822 NW2d 271 (2012), aff'd 495 Mich 33 (2014), overruled in part on other grounds by *People v White*, 501 Mich 160, 164 n 2 (2017). Defendant raised this issue after he was sentenced. Accordingly, it is preserved. This Court reviews constitutional issues de novo. *Darden*, 230 Mich App at 600.

The Ex Post Facto Clauses of both the federal and state constitutions, US Const, art I, § 10; Const 1963, art 1, § 10, prohibit retroactive application of a law if the legislation:

> (1) punishes an act that was innocent when the act was committed; (2) makes an act a more serious criminal offense; (3) increases the punishment for a crime; or (4) allows the prosecution to convict on less evidence. [*People v Neilly*, ___ Mich ___; ___ NW3d ___ (2024) (Docket No. 165185); slip op at 5-6, quoting *People v Earl*, 495 Mich 33, 37; 845 NW2d 721 (2014).]

In *Neilly*, ___ Mich at ___; slip op at 6, the Court addressed the same situation at issue here, when a law allegedly increases the punishment for a crime:

> At issue here is the third type of a violation of ex post facto provisions, i.e., when a law allegedly increases the punishment for a crime. To successfully challenge a statute's application on this ground, a defendant must first prove that the statute imposes a criminal punishment rather than a civil remedy. See *People v Betts*, 507 Mich 527, 542-543; 968 NW2d 497 (2021). The analysis regarding

-10-

whether a statute imposes a criminal punishment is a two-step inquiry that begins with the question whether the Legislature intended the statute as a criminal punishment or as a civil remedy. *Id*. at 542. If the Legislature intended the statute to be a criminal punishment, there is no further inquiry because retroactive application of the statute would violate ex post facto prohibitions. *Id*. at 543. However, if the Legislature intended the statute to be a civil remedy, the inquiry continues, *id*., and the reviewing court must then consider "whether the statutory scheme is so punitive either in purpose or effect so as to negate the State's intention to deem it civil," *Earl*, 495 Mich at 38 (quotation marks, citation, and brackets omitted). To aid in that analysis, this Court has adopted from the United States Supreme Court the following nonexhaustive factors to be considered (i.e., "the *Mendoza-Martinez* factors"):

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned. [*Kennedy v Mendoza-Martinez*, 372 US 144, 168-169; 83 S Ct 554; 9 L Ed 2d 644 (1963) (citations omitted). See also *Earl*, 495 Mich at 43-44.]

In considering these factors to determine whether a statute "has the purpose or effect of being punitive," *Earl*, 495 Mich at 44, the Legislature's manifest intent to create a civil regulation will be rejected only when "a party challenging the statute provides the clearest proof that the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil," *Kansas v Hendricks*, 521 US 346, 361; 117 S Ct 2072; 138 L Ed 2d 501 (1997) (quotation marks, citation, and brackets omitted). [*Neilly*, ___ Mich at ___; slip op at 6-7.]

In *Betts*, 507 Mich at 573-574, our Supreme Court held "that the 2011 SORA may not be retroactively applied to registrants whose criminal acts subjecting them to registration occurred before the enactment of the 2011 SORA amendments." The Court explained that the 2011 SORA amendments amounted to ex post facto laws by increasing an individual's punishment in the aggregate for past offenses. *Id*. at 562. The Court vacated the defendant's conviction for failure to register as a sex offender. *Id*. at 574. However, the Court refused to invalidate all SORA-violation convictions that fit these criteria because it did not wish to encroach on the Legislature's authority. *Id*. at 565. The Court also specifically did not address the retroactive application of any post-2011 SORA amendments. *Betts*, 507 Mich at 574 n 30.

As explained in *Betts*, 507 Mich at 533-536, there have been multiple versions of the SORA over the years. This case involves the 2021 SORA, which was amended by 2020 PA 295, effective March 24, 2021. Defendant argues that the terms of the 2021 SORA do not apply to him because

the 2021 amendments were adopted after these crimes took place, making the 2021 SORA ex post facto legislation.

In *Betts*, 507 Mich at 548-549, the Court considered the Legislature's stated purpose of the SORA, as set forth in MCL 28.721a, and concluded that the Legislature likely intended the SORA as a civil regulation rather than a criminal punishment.[2] In *People v Lymon*, ___ Mich ___; ___ NW3d ___ (2024) (Docket No. 164685); slip op at 11-13, our Supreme Court recently followed *Betts* on this point to conclude that the Legislature intended the 2021 SORA as a civil regulation, not punishment. Consistent with *Betts*, the Court then applied each relevant factor from *Mendoza-Martinez* to determine whether the effects of the 2021 SORA are so punitive as to negate the intent to deem it a civil regulation. *Id*. at ___; slip op at 13.

First, the Court in *Lymon*, ___ Mich at ___; slip op at 14-18, concluded that the 2021 SORA resembles traditional forms of punishment, involving shaming and parole, because registrants are obligated to report in person, one to four times per year, depending on their tier level, MCL 28.725a(3). They are subject to supervision, like parolees, MCL 28.724, and must report changes in residence, employment, education enrollment, name, vehicle, e-mail address, Internet identifier, and telephone number, MCL 28.725(1), (2). They must pay a yearly fee, MCL 28.725a(6). The failure to abide by any of these requirements may result in imprisonment, similar to parole violators, MCL 28.729(1). *Lymon*, ___ Mich at ___; slip op at 15. In addition, reporting requirements have been altered, which includes a mail option, instead of reporting in person. *Id*. Nonetheless, the 2021 SORA also involves the traditional punishment of shaming, even though the defendant in *Lymon* was not required to appear on the public SORA website. *Id*. at ___; slip op at 16-17. The element of shaming impacts sex offenders, such as defendant, when he will be subject to registration on the SORA website, unlike the defendant in *Lymon*. Defendant, as a Tier III offender, must be identified on the SORA website. See MCL 28.728(4). However, in *Betts*, 507 Mich at 550-551, the Court also held that the 2011 SORA resembled banishment because of restrictions on registrants living, residing, working, or loitering within 1,000 feet of a school. That requirement has been eliminated from the 2021 SORA, so banishment is not part of the 2021 SORA. *Lymon*, ___ Mich at ___; slip op at 14.

The second factor is how the effects of the 2021 SORA are felt on a defendant as a registrant. If they include only minor restraints, then the effects are unlikely to be punitive. *Id*. at ___; slip op at 18. Here, the facts do not appear to significantly differ from how the 2021 SORA impacted the defendant in *Lymon*, ___ Mich at ___; slip op at 18-21. As a Tier III offender, defendant must report four times to verify or update his information after his initial registration, MCL 28.725a(3)(c). The defendant in *Lymon* was a Tier I offender, who was required to report once per year after his initial registration. *Id*. at ___; slip op at 7, 18. The registration process includes the payment of fees and travel expenses when reporting must be done in person. *Id*. at ___; slip at 18. These requirements, in addition to other requirements to update personal information, with the threat of imprisonment for noncompliance, amounted to punishment,

---

[2] The Legislature's declaration of the purpose of the SORA, found at MCL 28.721a, is not affected by the more recent amendments to the SORA, but that statute has not changed since 2002 PA 542, effective October 1, 2002.

according to the Supreme Court in *Lymon*, despite the elimination of some requirements found in the 2011 SORA. *Id*. at ___; slip op at 19-21.

The third factor, the promotion of the traditional aims of punishment, was also found to exist in the 2021 SORA in *Lymon*, ___ Mich at ___; slip op at 21-22, because the 2021 SORA involves the traditional penological goal of retribution. On this factor, the Court followed its analysis from *Betts*, 507 Mich at 556-558, that the 2011 SORA supported the aim of retribution by imposing registration requirements on offenders without regard to their individual risk of danger. Thus, the SORA imposed retribution for past conduct, rather than to prevent future sexual offenses. *Lymon*, ___ Mich at ___; slip op at 21-22. Because the 2021 SORA continues to impose its requirements solely on the basis of prior offenses with no individualized assessment of an offender's risk, the 2021 SORA continues to also support retribution as a penological goal. *Id*. at ___; slip op at 22.

The fourth factor, whether there is a rational connection to the nonpunitive purpose of the 2021 SORA, the Court in *Lymon* again gave weight to the fact that the defendant was a nonsexual offender. The Legislature's intent in adopting the SORA was primarily for public safety, by identifying offenders and alerting the public. *Id*. at ___; slip op at 22-23; MCL 28.721a. However, this *Mendoza-Martinez* factor only requires that the Legislature's decision is rational, not that it is narrowly tailored or adopts the most effective means to achieve the nonpunitive goal. Because of this low bar, the Supreme Court in *Lymon*, ___ Mich at ___; slip op at 23-24, concluded that including nonsexual offenders in the SORA's requirements is rationally related to protecting the public against those who may pose a danger. That analysis would apply equally to defendant, who is a sex offender, and, therefore, the Legislature's intent to protect the public would be served by requiring that he register and be included on the public website to alert the public.

The fifth and final factor considered by the Court in *Lymon*, ___ Mich at ___; slip op at 24, was whether the 2021 SORA is excessive with respect to its nonpunitive purpose. For this factor, the Court must review whether the 2021 SORA is a reasonable means of protecting the public from the commission of future criminal acts. *Id*. The *Lymon* Court concluded that the 2021 SORA imposed excessive restraints on nonsexual offenders when they are branded as sex offenders even if their offenses do not include any sexual component and no assessment has been made that they pose a danger to the community. *Id*. at ___; slip op at 24-28. This factor seems to weigh more heavily in favor of the defendant in *Lymon* because he was not a sexual offender, unlike defendant in this case. In other words, in the case of sexual offenders, it appears that—contrary to the holding in *Lymon*—the 2021 SORA is more than likely considered a reasonable means of protecting the public from the commission of future sexual criminal acts by sexual offenders, like defendant. We are mindful, however, of the concern expressed in *Betts*, 507 Mich at 560-561, that the research more recently shows that the fears about sex offenders have been overstated and that they may actually be less likely to reoffend.

In *Lymon*, ___ Mich at ___; slip op at 29-30, the Court ultimately concluded that the defendant demonstrated that the 2021 SORA is so punitive in its purpose or effect as to negate the Legislature's intent to deem it a civil regulation and thus constituted punishment—as applied to non-sexual offenders. However, after reviewing that decision, it appears to us that a stronger argument can be made in this case—involving a sexual offender—that the 2021 SORA has the impact of a civil regulation as opposed to criminal punishment. In other words, we could conclude

that the 2021 SORA is not so punitive in effect or purpose to negate the Legislature's intent to adopt a civil regulation.

But we need not decide that issue now because even if defendant can show that the 2021 SORA amounts to punishment, i.e., ex post facto legislation, defendant has not explained how the 2021 SORA is more punitive to him than the 2011 SORA. Applying the test from *Neilly*, ___ Mich ___; slip op at 5-6, defendant must show that the 2021 SORA actually increases the punishment for the crimes of CSC-I and CSC-II. But defendant fails to address how the 2021 SORA *increased* the actual punishment he is now facing. He offers no analysis on what parts of the 2021 SORA involve different and more harsh punishment than existed under the 2011 SORA. Defendant has failed to support his argument that the 2021 SORA violates the Ex Post Facto Clauses of the state or federal constitutions by demonstrating that he is facing more severe punishment under the 2021 SORA so as to make it unconstitutional as ex post facto punishment. Accordingly, defendant is not entitled to any relief.[3]

## V. MANDATORY SEX OFFENDER REGISTRATION FOR LIFE

Defendant is required to register as a sex offender for life because he is a Tier III offender. MCL 28.722(u)(*ii*), (v)(*iv*); MCL 28.725(13). He argues that this amounts to cruel or unusual punishment and he preserved that argument by raising it before the trial court. See *People v Burkett*, 337 Mich App 631, 635; 976 NW2d 864 (2021). We review this issue de novo. *Darden*, 230 Mich App at 600.

The federal constitution bars "cruel and unusual punishment," US Const, Am VIII, while the state constitution prohibits "cruel or unusual punishment," Const 1963, art 1, § 16. Defendant relies on the state constitution when it provides broader protection. *People v Stovall*, 510 Mich 301, 313-314; 987 NW2d 85 (2022). When analyzing whether a punishment is cruel or unusual, this Court considers the following factors: (1) the harshness of the penalty compared to the gravity of the offense, (2) the penalty imposed for the offense compared to penalties imposed for other offenses in Michigan, (3) the penalty imposed for the offense in Michigan compared to the penalty imposed for the same offense in other states, and (4) whether the penalty imposed advances the goal of rehabilitation. *People v Bullock*, 440 Mich 15, 30, 33-34; 485 NW2d 866 (1992).

In *People v Jarrell*, 344 Mich App 464, 483-485; 1 NW3d 359 (2022), app for lv held in abeyance pending the decision in *Lymon*, ___ Mich ___; 994 NW2d 778 (2023), this Court reviewed the mandatory lifetime registration requirement for a defendant convicted of CSC-I, involving sexually penetrating the victim without consent and unlawful imprisonment. This Court noted that there are few crimes more severe than CSC-I. Considering the gravity of the offense

---

[3] However, even if this Court was inclined to accept defendant's argument, the remedy for a violation of the Ex Post Facto Clauses is to impose the punishment existing at the time of the offense. Therefore, this Court would not vacate the requirement that he register under the SORA, as defendant requests, but he could still be subject to the 2011 SORA. *Neilly*, ___ Mich at ___; slip op at 20 n 12.

committed by that defendant, including that he faced a statutory maximum life sentence, this Court concluded that the requirement for lifetime registration was not disproportionate to the offense.

In this case, defendant is also facing CSC-I, but involving an offense against a very young victim. There is no dispute this is one of the most heinous offenses. However, defendant has not offered any reasons why the requirement that he register for life as a sex offender is disproportionate. He claims that the punishment is imposed without an individualized assessment, but he offers no reasons why the trial court would have required him to register for a shorter period if it could have engaged in an individualized assessment.

In *Jarrell*, 344 Mich App at 485-486, this Court also concluded that the defendant did not show that the mandatory lifetime registration requirement for sex offenders is unduly harsh compared to penalties imposed for other offenses in Michigan or for penalties in other states:

> Second, Jarrell's mandatory lifetime sex offender registration is not unduly harsh as compared to penalties imposed for other offenses in Michigan. Mandatory punishment provisions are not uncommon, particularly for CSC-I convictions. For instance, depending on the age of the offender and victim, a CSC-I conviction may involve a mandatory 25-year minimum sentence, MCL 750.520b(2)(b), or a mandatory life sentence, MCL 750.520b(2)(c). "Legislatively mandated sentences are presumptively proportional and presumptively valid," *People v Brown*, 294 Mich App 377, 390; 811 NW2d 531 (2011), and "a proportionate sentence is not cruel or unusual," *People v Bowling*, 299 Mich App 552, 558; 830 NW2d 800 (2013). Jarrell has failed to overcome the presumption that mandatory lifetime sex offender registration is proportional as applied to his case, and he cannot show that such a penalty is disproportionately harsh compared to other penalties imposed in Michigan.

> Third, comparing the penalty to that imposed by other states, mandatory lifetime sex offender registration is not unique to Michigan. Many states have a tiered system for sex offender registration, with lifetime registration reserved for the most heinous perpetrators of sexual assault.

With regard to the second and third requirements, defendant argues that mandatory lifetime registration and in-person reporting requirements are disproportionate, but the panel in *Jarrell* concluded that they are not disproportionately harsh for sexual offenses, particularly considering the age of the victim and the age of the offender. Defendant has not shown that *Jarrell* was wrongly decided on these factors.

On the fourth factor, this Court in *Jarrell*, 344 Mich App at 486-487, agreed with the defendant that registration under the SORA does not advance the goal of rehabilitation, but that this was not enough to prevent enforcement of the mandatory registration requirement:

> Finally, considering whether lifetime registration advances the goal of rehabilitation, we agree with Jarrell that his obligations under SORA will not assist his rehabilitation. See *Betts*, 507 Mich at 556, 560-562 (recognizing a "growing body of research" supporting that "sex-offender registries have dubious efficacy in achieving their professed goals of decreasing recidivism"). But while lifetime

-15-

registration under SORA does not advance the goal of rehabilitation, the other three factors strongly support that such a punishment is neither cruel nor unusual as applied to Jarrell's CSC-I convictions. Therefore, we conclude that SORA's lifetime-registration requirement is not unjustifiably disproportionate under the circumstances of this case. Jarrell has not established plain constitutional error in his as-applied challenge that the requirements of SORA violate the Michigan Constitution's prohibition on cruel or unusual punishment.

Consistent with this Court's opinion in *Jarrell*, we conclude that mandatory lifetime registration under SORA for certain offenses does not amount to cruel or unusual punishment.

## VI. LIFETIME ELECTRONIC MONITORING

Per MCL 750.520b(2)(d), defendant is subject to lifetime electronic monitoring for his conviction of CSC-I. His convictions for CSC-II also qualify for lifetime electronic monitoring because defendant was over the age of 17 years and JS was under the age of 13 years at the time of the offenses. See MCL 750.520c(2)(b). He argued that requiring him to submit to lifetime electronic monitoring is cruel and/or unusual punishment, US Const, Am VIII; Const 1963, art 1, § 16, because this form of punishment was adopted on the basis of faulty research about the danger posed by sexual offenders. In addition, he argues that there was no assessment made of the risk he posed for reoffending and there is no way of petitioning for removal from this requirement. Defendant also claims that being required to wear an electronic monitor constitutes an unreasonable search, US Const, Am IV. Defendant preserved his arguments by raising them before the trial court. See *Burkett*, 337 Mich App at 635. We review this issue de novo. *Darden*, 230 Mich App at 600.

In *People v Hallak*, 310 Mich App 555, 566-567; 873 NW2d 811 (2015), rev'd in part on other grounds 499 Mich 879 (2016), this Court addressed whether lifetime electronic monitoring, MCL 750.520n(1), for CSC-II where the victim is under the age of 13 and the perpetrator is over the age of 17, is cruel or unusual punishment, both facially and as applied to the defendant, who had no prior record. This Court agreed with the defendant that lifetime electronic monitoring is a punishment. *Hallak*, 310 Mich App at 569-571.

However, the Court in *Hallak*, 310 Mich App at 571-577, concluded that lifetime electronic monitoring is not cruel or unusual punishment, either on its face or as applied to the defendant. Defendant now challenges the opinion in *Hallak* because other courts have questioned whether sexual offenders are particularly dangerous on the basis of newer research which shows that recidivism rates are actually lower among sexual offenders. See *Betts*, 507 Mich at 558-561. In *Hallak*, 310 Mich App at 573, the Court acknowledged that lifetime electronic monitoring addresses the significant concerns of rehabilitation and recidivism. The Court considered both the high recidivism rate and the vulnerability of young victims as distinguishing sexual assaults against young victims from other crimes when looking at the harshness of the punishment of lifetime electronic monitoring. *Id*. at 574-575. Because this Court held in *Hallak* that lifetime electronic monitoring is not cruel or unusual punishment, this Court is required to follow that opinion. See MCR 7.215(C)(2).

Defendant additionally argues that lifetime electronic monitoring violates the federal constitution's prohibition against unreasonable searches, US Const, Am IV. Once again, this Court rejected that argument in *Hallak*, 310 Mich App at 577-581, and this Court is required to follow *Hallak* on this issue. MCR 7.215(C)(2). Accordingly, as set forth in *Hallak*, we conclude that lifetime electronic monitoring of serious sex offenders is not unconstitutional.

Affirmed.

/s/ Kirsten Frank Kelly
/s/ Mark J. Cavanagh
/s/ Michael J. Kelly